Wᴵʟʟᴵᴀᴍ F. Zᴵᴍᴍᴇʀ, *Appellant,* v. Sᴛᴀᴛᴇ ᴏꜰ Kᴀɴꜱᴀꜱ, *Appellee.*

(477 P. 2d 971)

Opinion filed December 12, 1970.

*Wayne T. Stratton* and *Arthur E. Palmer*, of Topeka, argued the cause and were on the brief for the appellant.

*Gene M. Olander*, county attorney, argued the cause, and *Kent Frizzell*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is a postconviction proceeding. William F. Zimmer was convicted by a jury of the offenses of kidnaping in the first degree, with harm inflicted (K. S. A. 21-449) and murder in the first degree (K. S. A. 21-401). The jury imposed death for the kidnaping and life imprisonment for the murder. Upon direct appeal the conviction and sentences were affirmed (*State v. Zimmer*, 198 Kan. 479, 426 P. 2d 267, cert. den. 389 U. S. 933, 19 L. ed 2d 286, 88 S. Ct. 298). Reference is made to that decision for facts supplementary to those stated herein.

Zimmer then commenced this proceeding for relief under K. S. A. 60-1507. The trial court held a pretrial conference in the nature of an omnibus hearing with appellant present, at which it made a definitive order narrating the factual history, reciting agreements of the parties with respect to evidence, stating issues, requiring the prosecution to submit to requested discovery procedure and furnish certain services requested by appellant, and generally establishing a blue print for the formal hearing. In this order the court specifically stated all issues on which proof was offered would be decided on their merits.

After evidentiary hearing at which Zimmer appeared and was represented by present court-appointed counsel the trial court modified appellant's sentence by vacating the death penalty and resentencing him upon the kidnaping charge to life imprisonment. In all other respects appellant's application was denied and he now appeals.

Evidence adduced at the 60-1507 hearing will be referred to as necessary in considering appellant's specifications of error.

Under our law, in event of conviction by a jury of the offenses of first degree murder or aggravated kidnaping, the jury is required to fix the penalty either at death or life imprisonment (formerly K. S. A. 21-403 and 21-449, now K. S. A. 1970 Supp. 21-4501 [a] ). Prior to appellant's initial trial the then presiding judge in chambers excused nineteen prospective jurors from service in the case, without *voir dire* examination, because of their indication of conscientious or religious objection to the death penalty. At trial upon *voir dire* examination thirty-one additional veniremen were, upon the state's challenge for cause, excused upon their statement they had conscientious or religious objection to imposition of the death penalty. No effort was made to probe prospective jurors' attitudes within the dimensions of K. S. A. 62-1404 or 62-1405.

At the postconviction proceeding the court applied the retroactive rule announced June 3, 1968, in *Witherspoon v. Illinois,* 391 U. S. 510, 20 L. ed. 2d 776, 88 S. Ct. 1770, that a death sentence cannot constitutionally be executed if imposed by a jury from which have been removed for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty, and, upon this basis, the trial court vacated appellant's death sentence and resentenced him to life imprisonment upon the kidnaping charge.

Appellant now contends the exclusion of jurors evincing opposition to capital punishment denied him trial by a representative and impartial jury on the issue of guilt or innocence, in violation of the due process and equal protection clauses of the state and federal constitutions. The contention is based largely on the theory that people who have a belief, attitude or prejudice upon one issue frequently have a predictable belief, attitude or prejudice upon another. As applied here, appellant urges that selective exclusion of jurors having an attitude against capital punishment amounts to selective exclusion of jurors whose verdict would tend more toward innocence than guilt, thus resulting in a more prosecution prone jury with increased risk of conviction.

As presented, the contention has both legal and factual aspects. In its support appellant offered at the 60-1507 hearing certain testimony and exhibits upon which in an excellently prepared memorandum opinion the trial court acted as follows:

"Issue A. (1). Did the exclusion of jurors who opposed the death penalty result in an unrepresentative jury on the issue of guilt and increase the risk of conviction?

"*Findings of Fact:*

"1. Dr. Hans Zeisel, witness for petitioner, testified that he is Professor of Law in Sociology at the University of Chicago Law School.

"2. For approximately fifteen years he has studied the jury system.

"3. He made various studies on jury attitudes toward capital punishment and authored 'Some Data on Jury Attitudes Toward Capital Punishment.'

"4. He participated in a study in the criminal court in Chicago and in Brooklyn of actual jurors who sat on criminal trials. These results, supplemented by an analysis of data from the Gallup Poll and California Poll, were produced in the publication cited above (Petitioner's Exhibit 13).

"5. The results of the above show, according to the witness, that the exclusion of jurors who have scruples against capital punishment results in an unrepresentative jury of the population as a whole and further increases the chances of a defendant in a criminal case to be convicted.

"6. Several other studies have been made independently (Petitioner's Exhibits 14 through 18) with similar results.

"*Conclusions of Law:*

"1. Petitioner's Exhibits 13 through 18 were taken under advisement as to their admissibility. Petitioner offers them under K. S. A. 60-460(cc) as Learned Treatises.

"2. The Court finds that Exhibits 13 through 18 are not admissible on the basis that said exhibits are inadequate and unreliable to prove that a given jury would be more prone to convict a defendant if all those who opposed the death penalty because of scruples were removed. Further this testimony is speculative and conjectural.

"3. The petitioner has failed to sustain the burden of proof on this issue and the Court finds against the petitioner on the merits."

In *Witherspoon* the petitioner made the same complaint as here, concerning which the court stated:

"He maintains that such a jury, unlike one chosen at random from a cross-section of the community, must necessarily be biased in favor of conviction, for the kind of juror who would be unperturbed by the prospect of sending a man to his death, he contends, is the kind of juror who would too readily ignore the presumption of the defendant's innocence, accept the prosecution's version of the facts, and return a verdict of guilt. To support this view, the petitioner refers to what he describes as 'competent scientific evidence that death-qualified jurors are partial to the prosecution on the issue of guilt or innocence.'

"The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared

to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was. . . . It has not been shown that this jury was biased with respect to the petitioner's guilt." (pp. 516-518.)

Footnote 21 of the majority opinion in *Witherspoon* includes the following:

"Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case." (p. 523.)

In a companion case, *Bumper v. North Carolina,* 391 U. S. 543, 20 L. ed. 2d 797, 88 S. Ct. 1788, the jury had returned a verdict of guilty of rape with a recommendation of life imprisonment and the petitioner was sentenced accordingly. He attacked the conviction on the ground his constitutional right to an impartial jury had been violated because the prosecution was permitted to challenge for cause all prospective jurors who voiced objection to capital punishment. In rejecting this contention the court stated:

"Our decision in *Witherspoon* does not govern the present case, because here the jury recommended a sentence of life imprisonment. The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury. [Citations] We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily 'prosecution prone,' and the materials referred to in his brief are no more substantial than those brought to our attention in *Witherspoon.* Accordingly, we decline to reverse the judgment of conviction upon this basis." (p. 545.)

*Witherspoon* and *Bumper* footnotes reveal that those petitioners had submitted in their briefs and petitions certain surveys and studies of a sociological or psychological nature supporting their position factually. Apparently this material was the same as that contained in exhibits 13, 15, 16 and 17 in the case at bar, and sought unsuccessfully to be introduced as exhibits through the testimony of Doctor Zeisel.

The trial court in effect determined as a fact that the evidence submitted did not show appellant had been convicted by an unrepresentative jury on the issue of guilt or that its method of selection increased the risk of conviction. In this view we must concur. All the evidence proffered, including the exhibits rejected, amounted to little more than that deemed unacceptable in *Witherspoon* and *Bumper* as tentative, fragmentary and lacking in sub-

stance. In fact, the sponsoring witness, although expressing confidence in the reliability of the studies when taken in connection with other data, conceded shortcomings arising from inherent limitations in the studies. At most, the entire matter seems still in the realm of scientific exploration with little in the way of reliable principles fairly demonstrable.

Closely allied with the foregoing is appellant's complaint the trial court erroneously excluded the six exhibits proffered by him as learned treatises under K. S. A. 60-460 (cc), which provides, as an exception to the hearsay rule:

*"Learned treatises.* A published treatise, periodical or pamphlet on a subject of history, science or art [is admissible] to prove the truth of a matter stated therein if the judge takes judicial notice, or a witness expert in the subject testifies, that the treatise, periodical or pamphlet is a reliable authority in the subject."

Mere publication does not *ipso facto* render a work admissible as independent substantive evidence. Such a work becomes admissible when a proper foundation has been laid—establishment of its reliability either by means of judicial notice being taken or the attestation of an expert witness. Necessarily, to mitigate objections to this type of evidence which might justifiably be lodged in particular circumstances, considerable judicial discretion is in order in determining what works are, and what works are not, for one reason or another, sufficiently worthy of trust to be considered as substantive evidence (see VI Wigmore on Evidence, 3d ed., § 1692; Gard's Kansas Code of Civil Procedure, Author's Commentary, § 60-460 [cc], pp. 498-499). We hold the determination of reliability requisite to admission into evidence of learned treatises rests in the sound discretion of the trial court.

We have already indicated concurrence in the trial court's view of the proffered exhibits. Moreover, the substance of the content of those documents was made known to the trial court, the trier of the fact, through the oral testimony of Doctor Zeisel, so prejudicial error may in no event be predicated on the exclusion.

Appellant next contends our procedure in a capital case wherein a jury determines both guilt and punishment is unconstitutional in that it compels an accused to testify against himself and denies him due process of law. Appellant says if he desires to offer evidence in mitigation of punishment, he must do so before the same jury which determines guilt and, upon cross-examination, run the risk

of bolstering the prosecution's case against him. He contends that under our single trial procedure he must either waive his constitutional privilege against self-incrimination by testifying before the jury prior to its determination of his guilt or he must forego an opportunity to explain why, if convicted, he should receive the lesser penalty. Upon this issue the trial court found that appellant's counsel at his initial trial thought it necessary for appellant to testify in order to minimize the penalty should he be found guilty. Appellant did testify at the trial at which he was convicted (see summary, *State v. Zimmer,* supra, pp. 493-496).

A few states have now provided for bifurcated trials in criminal cases, one to hear evidence upon the guilt issue, and if there be a finding of guilty, another on the penalty phase. However, this is a policy matter for legislative determination.

Traditionally, in capital cases particularly, juries have determined both guilt and penalty in the same proceeding. Initially, in Kansas as in many jurisdictions, upon conviction of certain offenses, the death penalty was mandatory with no alternative permitted. Eventually, the sentencing authority was permitted to fix punishment for such offenses either at death or life imprisonment. So the role of the jury in sentencing where jury trial is had is essentially in mitigation of the practice of automatic imposition of the extreme penalty. Although not treating with constitutional impact except as may be derived under the concept of basic fairness, the Advisory Committee on Sentencing and Review for the American Bar Association Project on Minimum Standards for Criminal Justice has recognized several considerations arguing for retention of a role for the jury in cases where imposition of the death penalty is at issue. (Approved Draft, 1968, Sentencing Alternatives and Procedures, § 1.1 [c], p. 47).

We know of no constitutional right in an accused to speak to the sentencing authority corresponding to his right against self-incrimination. In any case, capital or otherwise, an accused makes a weighted decision in choosing whether he will claim this latter right. Calculated risk inheres in this kind of choice. In some instances the preference might be to testify upon only one aspect or element of the alleged offense but this has never been permitted. Compulsion for an accused to take the witness stand, whether in an effort to mitigate a possible penalty or for whatever reason, arises from his own desire to act in his advantage as he sees it—

not from any coercion or burden imposed by the state. The state must first, of course, produce evidence of guilt before the accused is put to his choice. We are unable to spell out constitutional infringement in making that choice under our statutory procedure in capital cases. Courts in other jurisdictions have uniformly rejected the same contention. In *Spencer v. Texas*, 385 U. S. 554, 17 L. ed. 2d 606, 87 S. Ct. 648, (1967), rehearing den. 386 U. S. 969, 18 L. ed. 2d 125, 87 S. Ct. 1015, in an analogous situation the court stated:

"Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure." (p. 568.)

Appellant contends the lack of grand jury indictment denied him due process of law and rights guaranteed by the fifth amendment to the federal constitution. Appellant was proceeded against by complaint and warrant, then was accorded preliminary examination before a magistrate at which he was held for appearance in district court, where trial was had upon information, all in conformity with our code of criminal procedure. In *Bailey v. Hudspeth*, 164 Kan. 600, 191 P. 2d 894, this court held:

"Prosecution for a capital or otherwise infamous crime in a Kansas court of competent jurisdiction by information, followed by trial, conviction, and sentence to the state penitentiary, all in conformity with the code of criminal procedure of the state of Kansas, does not deprive a citizen of the United States of his liberty in violation of, or rights guaranteed by, the provisions of either the Fourteenth or Fifth amendments to the constitution of the United States." (Syl.)

Many authorities were cited in support of this conclusion, among them *Hurtado v. California*, 110 U. S. 516, 28 L. ed. 232, 4 S. Ct. 111. The same contention presented here was recently raised by a state prisoner in *Morford v. Hocker*, 394 F. 2d 169, cert. den. 392 U. S. 944, 20 L. ed. 2d 1406, 88 S. Ct. 2329, rehearing den. 393 U. S. 900, 21 L. ed. 2d 194, 89 S. Ct. 78, in which the court commented:

"In the landmark decision in Hurtado v. People of State of California . . . the Supreme Court rejected this contention, and that decision has been followed ever since. . . . If any rule can be regarded as settled, the *Hurtado* rule is." (p. 170.)

Appellant contends he was denied counsel at critical stages of the proceedings against him. He points first to the fact he was without counsel during the period December 21, 1964, to February 2, 1965. Appellant made this same contention on direct appeal where

it was determined adversely to him (*State v. Zimmer,* supra). Rule 121 (*c*) of this court provides that a proceeding under 60-1507 cannot ordinarily be used as a substitute for a second appeal (205 Kan. xviii). Nothing new is presented and we see no reason to reexamine the issue. Appellant also complains he was without counsel after denial in this court of his motion for rehearing of direct appeal and the time the trial court in the postconviction proceeding appointed counsel for him. The trial court made extended findings of fact as to both periods, and concluded appellant was adequately represented by counsel at all critical stages and that in the postconviction proceedings he "had counsel furnished to him without any delay to his detriment." Following denial of motion for rehearing in this court appellant was represented upon his *certiorari* application to the United States Supreme Court by an attorney furnished by the American Civil Liberties Union. The trial court's findings are fully supported by evidence and may not be disturbed. Appellant has been represented throughout this proceeding by zealous and skillful counsel.

Appellant next contends certain items taken from his automobile and received in evidence against him were obtained as a result of an illegal seach and seizure. This issue was raised upon direct appeal and determined adversely to him on the basis he had expressly, voluntarily and intelligently consented to the initial search (*State v. Zimmer,* supra). Appellant would now bypass this roadblock by a showing at the 60-1507 hearing that he had, prior to the time he consented to the search, consumed a quantity of pills shown by posttrial analysis to contain methamphetamine; further, a pharmacologist testified his best judgment was, because of the consumption of a combination of alcohol and methamphetamines, appellant did not understand the natural consequences of his actions, and in fact, it was highly unlikely appellant knew the difference between right and wrong. One difficulty with appellant's new approach is the trial court made specific findings against him on the factual issue. The court found that at the time appellant gave his consent to the vehicular search he was not under the influence of intoxicating liquor or drugs so as to be unable to comprehend intelligently the nature of the request to search and it concluded appellant was mentally capable of giving consent and did voluntarily and intelligently do so.

By stipulation of the parties the transcript of appellant's first trial

was made a part of the evidence to be considered at the postconviction hearing. Thus the court had before it much testimony showing appellant's activities and participation in events preceding and leading up to the giving of his consent to the search, including his heavy use of alcohol and pills, as summarized in our prior opinion. And the trial court was fully aware of the previous proceedings concerning analysis of a pill of the type consumed by appellant. He was represented at his first trial by able, conscientious counsel. Both appellant and his counsel knew of appellant's use of pills and of appellant's right to have an analysis of them made at public expense. As stated in our first opinion, the state's failure to have the pill analyzed by the Kansas Bureau of Investigation was not an instance of suppression of evidence by the prosecution. And, as will be hereafter demonstrated, appellant had adequate opportunity to produce further testimony concerning the pill had he desired to do so. Certainly the additional testimony produced at the postconviction proceeding respecting the exact nature of the pills, and their effect, cannot be said to be newly discovered evidence not previously obtainable so as to warrant new trial.

Whether appellant was capable of giving voluntary, intelligent consent to a search of his vehicle is essentially a question of fact. That question has now been twice determined against him, first by implication and now expressly. The record contains sufficient evidence to support the findings made and upon appellate review they may not be disturbed.

Appellant urges suppression of evidence in two respects. Despite our prior adverse ruling on the same issue, he again presents failure of the convicting court to order analysis of a pill by the Kansas Bureau of Investigation. Once more, a postconviction proceeding cannot ordinarily be used as a substitute for a second appeal. However, the postconviction court patiently went into the facts as disclosed by the first record. In addition to that which was said in our former opinion we need only add the court found that appellant's counsel cross-examined a prosecution witness as to his knowledge of amphetamine pills and reaction to them upon use; that counsel's request for continuance on March 9, 1965, was based upon the premise it would require from one week to ten days to complete an analysis of the pill; that trial commenced on March 15, 1965, and the parties rested on March 30, 1965; that appellant was aware of the contents of the pill in question at the time of trial. The court

concluded appellant had failed to establish any prejudice by denial of a continuance, and that he had had adequate opportunity and time to produce testimony at the trial concerning the effects of the pill on the issues of sanity, degree of crime, lack of capacity to consent to search and severity of punishment. The findings are amply supported by evidence.

Appellant's second allegation of suppression of evidence is that the prosecution was aware of three persons whose testimony would have been inconsistent with that offered by a prosecution witness, the liquor store clerk, concerning the presence of appellant and a small Negro girl in the city of Wamego on the day of the abduction. These persons were not offered as witnesses and apparently appellant's counsel was unaware of their knowledge. Again the post-conviction court made extensive detailed findings on the issue. It reviewed statements of these three persons which had been obtained by the prosecution in pretrial investigation, along with the evidence actually offered, and it concluded, as a fact, that the statements were not inconsistent as alleged and there was no suppression or failure to disclose evidence which tended to be favorable to appellant, either on the issue of guilt or punishment. Our review results in the same conclusion.

Appellant asserts his constitutional rights were infringed when the examining magistrate, prior to preliminary examination, denied his request that he be furnished the services of a psychiatrist. The contention is that such failure deprived appellant of possible testimony regarding the presence of methamphetamine still in his system at that time. Appellant presents no cogent argument or authority for his position and we know of none. The convicting court, prior to trial, appointed a sanity commission to examine appellant and appellant produced at the trial medical witnesses on the issue of his mental condition.

Appellant contends the convicting court failed to instruct the jury adequately as to the venue of the murder charge. At most the alleged error was but an element of trial, correctable only on direct appeal (Rule 121 [c]). However, we note the first instruction given to the jury included the allegation in the information upon which the case was tried that both offenses occurred in Shawnee county, Kansas. Other instructions as to the proof required were tied into this so that the jury was adequately instructed as to venue, which, in the direct appeal, we determined was properly established in Shawnee county.

Appellant again complains the convicting court in reciting its instructions orally to the jury failed to read the non-guilty form of verdict. Appellant argues he had, on postconviction hearing, additional evidence on the subject not before presented. We have re-examined the original briefs and abstracts and find nothing new from that considered by us upon the direct appeal, hence the matter is not a proper subject for further review (Rule 121 [c]).

Appellant contends the lineup procedure at which he was identified by a key prosecution witness was so unfair as to amount to infringement of his right to due process of law. He recognizes that the *Wade-Gilbert* rule is not applicable because the lineup was held prior to June 12, 1967. It appears appellant was required to appear at a police lineup in Topeka on November 16, 1964, at which he was required to step forward, give his name, address and occupation. At this lineup he was identified by the air force sergeant as the person he had seen with the victim in a field northwest of Topeka. It also appears that the Topeka morning newspaper of November 16 carried an article naming appellant as a suspect in the case who had been arrested. The sergeant did not testify at the postconviction hearing but at the initial trial he testified that at the time of the lineup it was possible he might have been informed that the automobile bearing the license number which he had jotted down was registered in appellant's name. There was no indication the sergeant had seen or heard of the newspaper article prior to the lineup. On the day preceding the lineup the sergeant had, out of a group of sixteen, identified two photographs of appellant as pictures of the man he had seen in the field. The postconviction court found there was other independent, competent and substantial evidence connecting appellant with the victim and with the particular automobile in which she was seen, and concluded appellant had failed to sustain the burden of proof on the issue. The evidence amply supports the finding made.

Appellant contends the incriminating statements made by him to police were used against him in violation of basic constitutional due process requirements in view of the totality of the circumstances including his use of methamphetamine which causes severe mental and physical depression, the illegal search and seizure, defective pre-interrogation statement as to right to counsel and method of

police interrogation. The postconviction court, after review of the entire trial transcript found:

"*Findings of Fact:*

"1. At the time of arrest and subsequent thereto during interrogation, petitioner was not under the influence of intoxicating liquor and/or drugs to render him incapable of comprehending the nature of the conversations or to give any statement.

"2. Petitioner was advised that he could obtain a lawyer and that he did not have to make a statement and that any statement he made could be used against him.

"3. Petitioner did have access to a lawyer on November 16, 1964, one day after his arrest.

"4. The statements made by petitioner were freely and voluntarily made.

"*Conclusions of Law:*

"1. Petitioner failed to sustain the burden of proof that at the time he was arrested and subsequent thereto he was incapable of making any statement or admission or comprehend the significance of the same.

"2. All statements and admissions were freely and intelligently made by petitioner and were voluntary.

. . . . . . . . . . . . .

"4. The questioning and interrogation of the petitioner was not conducted with any coercion, illegality or lack of 'fair play.'

"5. Petitioner has failed to sustain the burden of proof on this issue and the Court finds against petitioner on the merits."

Much of appellant's attack is based upon his version of disputed factual contentions, as for example, his assertion the police in their questioning deceived him in certain particulars, but such disputes have now been resolved against him. Here again the trial court's findings and conclusions are sufficiently supported by evidence. More need not be said.

Finally, appellant contends there was jury misconduct vitiating the conviction. Such a specification amounts to no more than trial error, correctable only upon direct appeal. In *Tuscano v. State,* 206 Kan. 260, 478 P. 2d 213, we held:

"It is only where trial errors impinge on constitutional rights that they will be considered in a post-conviction action brought under K. S. A. 60-1507, and then only in exceptional circumstances." (Syl. ¶ 4.)

The record reveals no such exceptional circumstances. Nonetheless viewing the matter in its entirety, we cannot say appellant did not have a fair trial. The trial court found as follows:

"*Findings of Fact:*

"1. The witness, Norman P. Lutterman, was a juror in the criminal case. He was the only witness from the jury.

"2. During the course of the trial he watched television news broadcasts and read newspaper articles concerning the trial while it was in progress.

"3. He knew of other jurors who did likewise as the jurors discussed what they read and had seen during the separations.

"4. The jury discussed matters not in evidence, particularly, the fact that one juror, Boaz, knew 'a lot about the case from Lou Falley,' the Sheriff; that petitioner had property and railroad retirement and should not have had a court-appointed attorney; that petitioner might be able to get a parole from a life sentence.

"5. The juror, Lutterman, allowed a person to discuss the case with him outside court proceedings.

"6. The Court admonished the jury not to see, read or hear anything about the case outside of the courtroom and consider only the evidence admitted at the trial.

"7. Lutterman's decision was based upon what he heard in the courtroom.

"8. Lutterman had given thought about changing his vote with reference to the penalty of death to that of life.

"9. Lutterman was not threatened or coerced by anyone.

"*Conclusions of Law:*

"1. The jury was guilty of misconduct. But the misconduct was not such as to void the verdict of guilty and grant petitioner a new trial.

"2. The matters seen, read and heard by the jury were substantially what occurred in the courtroom.

"3. The petitioner failed to prove the extent and substance of what 'Boaz knew from Lou Falley' and failed to sustain the burden that this statement prejudiced the petitioner in the verdict of the jury.

"4. The decision of Juror Lutterman was based upon evidence heard in the courtroom.

"5. The discussion among the jurors concerning matters set out in finding No. 4 above went to the penalty not to the question of guilt or innocence. This misconduct would not support a verdict of death; but based upon the conclusions of law and judgment made by this Court setting aside the death penalty and death sentence, this question is moot.

"6. The petitioner failed to sustain the burden of proof and this issue is decided against him on the merits."

Although only one witness testified, the trial court's interpretation of that evidence did not wholly correspond to that urged then and now by appellant, particularly as to the coercive aspect of events related. The province of such interpretation lay, of course, in the trial court. The evidence was such we are unable to disagree with the trial court's analysis. We have reviewed the many cases cited by appellant. None speak out for reversal here.

The judgment is affirmed.

APPROVED BY THE COURT.