No. 45,835

STATE OF KANSAS, *Appellee,* v. KENNETH ARTHUR ROTH, *Appellant.*

(486 P. 2d 1385)

Opinion filed July 16, 1971.

*Gerald L. Goodell,* of Topeka, argued the cause, and *Thomas E. Wright,* of Topeka, was with him on the brief for the appellant.

*Gene M. Olander,* County Attorney, argued the cause, and *Vern Miller,* Attorney General, was with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: The defendant, Kenneth Arthur Roth, appeals from convictions by a jury of murder in the first degree (K. S. A. 21-401 [now K. S. A. 1970 Supp. 21-3401]) and of robbery in the first degree (K. S. A. 21-527 [now K. S. A. 1970 Supp. 21-3427]).

Roth, Dale Albert Chase, and Douglas Mark DeWitt were charged with the murder and robbery of James E. Long, a taxicab driver for the Yellow Cab Company of Topeka. Separate proceedings were had with respect to each of the accused. DeWitt entered a plea of guilty. Chase was tried to a jury, convicted of both charges, and his convictions were affirmed by this court in *State v. Chase,* 206 Kan. 352, 480 P. 2d 62.

Roth was convicted in April of 1969, and was sentenced to the Kansas State Penitentiary for a term of not less than ten nor more than twenty-one years on the robbery charge and life imprisonment on the murder charge. The sentences were directed to run concurrently.

The facts surrounding the vicious murder and robbery of Mr. Long on May 15, 1968, are fully set out in our opinion in *State v. Chase,* supra, and, except as related to the points discussed in the disposition of this appeal, need not be repeated.

Defendant specifies five points of error; the first of which concerns the trial court's denial of a challenge to the array of jurors. Defendant says selection of prospective jurors from the tax assessment rolls deprived him of his constitutional right to a jury composed of a truly representative cross section of the community.

Both parties agree the jury selection process followed in Shawnee County at the time of the trial here was that provided for by K. S. A. 43-102 [repealed, Laws of 1971, Chap. 176, Sec. 22]. (See, also, K. S. A. 43-135 to 150, incl., [repealed, Laws of 1971, Chap. 176, Sec. 22]).

K. S. A. 43-102, as it then appeared, provided in pertinent part that officials shall select from those on the assessment roll of the preceding year suitable persons having the qualifications of electors, and in making such selection the officials charged with the duty shall choose only those persons who are not exempt from serving on juries, who are possessd of fair character and approved integrity, in possession of their natural faculties, not infirm or decrepit, and who are well informed and free from legal exceptions.

The term "assessment roll" includes both real and personal property. (*State v. Gereke*, 74 Kan. 196, 86 Pac. 160.)

Defendant argues that a jury array, drawn from this source and limited by the qualifications mentioned, systematically excluded an economic class, *i. e.*, all non-property owners of Shawnee County, and thus resulted in an array which did not represent a true cross section of the community.

This court has been confronted with a similar question in a number of recent cases, several of which deal with the selection of jurors under the identical statute. In *State v. Stanphill*, 206 Kan. 612, 481 P. 2d 998, an array of jurors, drawn and summoned in Sedgwick County, pursuant to K. S. A. 43-154 [repealed, Laws of 1971, Chap. 176, Sec. 22], was challenged. In *Stanphill*, as in the instant case, the source and standards of qualifications of prospective jurors were controlled by 43-102. The import of the statute was discussed in considerable detail and the challenge was rejected. Justice O'Connor speaking for the court had this to say:

"With reference to what is now K. S. A. 43-102, this court has said the statute is directory, and a defendant may not cause the jury panel to be quashed on any ground which does not involve corruption, serious misconduct or palpable disregard of the law. Informalities and irregularities are not sufficient. (*State v. Carter*, 133 Kan. 718, 3 P. 2d 487. Also, see *State v. Snyder*, 126 Kan. 582, 270 Pac. 590; *State v. Frazier*, 54 Kan. 719, 39 Pac. 819; *State v. Jenkins*, 32 Kan. 477, 4 Pac. 809.)" (pp. 618, 619.)

In *State v. Clift*, 202 Kan. 512, 449 P. 2d 1006, cert. den. 396 U. S. 910, 24 L. Ed. 2d 186, 90 S. Ct. 225, the array was challenged on the ground that names of prospective jurors were taken from the personal property assessment rolls of Sedgwick County pursuant to the provisions of K. S. A. 43-154. The challenge was rejected because no systematic or purposeful exclusion of members of a race was established by proof. In the instant case, the assessment rolls included both real and personal property resulting in a cross section base broader than the source in *Clift*.

Although the challenge in *Clift* charged racial exclusion, we believe the rationale of both *Clift* and *Stanphill* is applicable to the question presented here. While defendant attempts to infer exclusion of an economic class from statistics shown in his brief, our examination of the abstracted portion of the *voir dire* examination fails to establish any systematic or purposeful exclusion of an economic or any other particular class of citizen.

Our most recent consideration of a challenge to an array is found in *State v. Theus*, 207 Kan. 571, 485 P. 2d 1327, wherein the legislative history of the methods of selecting jurors in this state was reviewed. Tax assessment rolls as a basic, though not an exclusive, source for jury selection was again approved. Our holding in *Stanphill* was restated with approval to the effect that as a general principle a jury panel is not to be quashed on any ground which does not involve corruption, serious misconduct or palpable disregard of the law. None of these elements is present here, and there is no showing that any impaneled juror was not qualified. We conclude, therefore, the trial court did not err in denying defendant's challenge to the array.

In his second assignment of error, defendant contends the exclusion of jurors (ten in this case), because of scruples against the death penalty, denied him a trial by a representative and impartial jury on the issue of guilt or innocence. The state asked for the death penalty, but the jury recommenced a life sentence. Subsequent to the perfection of this appeal, and the filing of defendant's brief, our decision in *Zimmer v. State*, 206 Kan. 304, 477 P. 2d 971, was announced, wherein we held:

"Exclusion of jurors opposed to capital punishment will not be presumed, nor was it shown by evidence adduced at postconviction hearing, to result in an unrepresentative jury on the issue of guilt or to increase the risk of conviction, in violation of constitutional standards." (Syl. ¶ 1.)

On oral argument defendant's counsel conceded the point raised is squarely determined by our decision in *Zimmer*, thus further discussion is unnecessary.

Likewise, because of our decision in *Zimmer*, defendant concedes his third point wherein he challenged the unitary trial of the issues of guilt and punishment. In *Zimmer* we held that an accused is not deprived of his constitutional rights against self-discrimination or of due process by a unitary trial wherein a jury determined guilt of a capital offense and then in the same proceeding determines whether the penalty should be death or life imprisonment.

At the time of our decision in *Zimmer* we relied heavily on *Spencer v. Texas,* 385 U. S. 554, 17 L. Ed. 2d 606, 87 S. Ct. 648 (1967). Our holding has since been buttressed by the recent decisions announced in *McGautha v. California* and *Crampton v. Ohio,* 401 U. S. ___, 28 L. Ed. 2d 711, 91 S. Ct. 1454 (1971), wherein it was held:

"The Constitution does not prohibit the States from considering that the compassionate purposes of jury sentencing in capital cases are better served by having the issues of guilt and punishment resolved in a single trial than by focusing the jury's attention solely on punishment after guilt has been determined." (Syl. ¶ 2.)

Defendant's next contention is twofold, it concerns a witness, Leonard Burton. Defendant first claims error in permitting the state to endorse Burton as an additional witness and then further argues that his testimony was irrelevant and inadmissible.

On March 7, 1969, the state filed a motion to endorse Burton and several other witnesses. The state's motion was heard and sustained on March 10, 1969. On the same date, the state furnished defendant's counsel a summary of Burton's testimony. On March 13, 1969, Burton was interviewed by an associate of defendant's counsel. The trial commenced on March 17, 1969, but it was approximately ten days thereafter when Burton was called as a witness. Under such circumstances, we fail to see how defendant could have been surprised by Burton's testimony or prejudiced by his endorsement as a witness. It is well settled that the endorsing of additional names of witnesses on the information rests in the sound discretion of the trial court and material prejudice in the ruling thereon must be clearly shown in order to constitute reversible error. (*State v. Mader,* 196 Kan. 469, 412 P. 2d 1001; *State v. Vernon King,* 190 Kan. 825, 378 P. 2d 147; and *State v. Wainwright,* 190 Kan. 619, 376 P. 2d 829.)

The testimony of Burton was admitted by the trial court over defendant's objection that it was totally irrelevant.

Burton had been an employee of the Jayhawk Hotel since 1930. During the period in question he worked the hours from 11 p. m. until 7 a. m. In substance Burton's testimony was that between 11:30 p. m. and 1:00 a. m., during May 14-15, 1968, he saw three boys crossing the street on the north side of the hotel. He could not identify them, other than that they were white, walking three abreast, the one in the middle was taller than the other two, all had long hair; they were wearing dark sweaters and were clowning

and laughing. Burton saw no one else on the street at the time. Burton could not remember the date but the time was fixed by Detective Landis, who interviewed Burton the day after the crime.

The principal witnesses for the state were the codefendants, Chase and DeWitt. They both testified that the three of them were together on Seventh Street on the north side of the Jayhawk Hotel and that they called the cab from the Yellow Cab taxi telephone on the north side of the hotel.

The Yellow Cab station referred to was identified as station No. 22. The company records, which were received into evidence, disclosed that a cab was called from station No. 22 at 12:28 a. m. [May 15, 1968]. Mr. Long's cab was dispatched and he reported that he had picked up passengers and was headed for the Highland Park High School. This was the last word received from Mr. Long.

Burton could not identify the three boys as such, but his testimony was not offered for that specific purpose. In weighing the relevancy of Burton's testimony it must be considered in the context in which it was given at the trial. The testimony of the state's principal witnesses, codefendants Chase and DeWitt, put the three boys together at the north side of the hotel; the cab company records established the time and place of the taxicab call. Burton's testimony was not only corroborative of but also consistent with other evidence as to time and place. There were no other persons on the street. Burton's general description of the three boys was consistent with other evidence in this regard. DeWitt was in fact taller than Chase or Roth. While defendant did not take the stand nor offer direct testimony on the main issue, as the trial progressed through defendant's skillfull cross-examination of the state's witnesses, the fact whether the three boys were together became an extremely material point. The testimony of Burton, for what it was worth, became relevant as tending to corroborate the testimony of Chase and DeWitt on this point.

The trial court carefully considered the relevancy of Burton's testimony in an out-of-court hearing before it was submitted to the jury. We believe the probability of connection was enough to support the trial court's determination of relevancy.

Relevancy is governed by the broad language of K. S. A. 1970 Supp. 60-401 (*b*) of our code of civil procedure which reads:

" 'Relevant evidence' means evidence having any tendency in reason to prove any material fact."

In considering relevancy under 60-401 (*b*) in *State v. Gauger,* 200 Kan. 563, 438 P. 2d 463, we quoted with approval our holding in the case of *In re Estate of Isom,* 193 Kan. 357, 394 P. 2d 21. There we held:

"For evidence to be admissible in the trial of a case it must be confined to the issues, but it need not bear directly upon them. To render evidence of collateral facts competent, there must be some natural, necessary or logical connection between them and the inference or result which they are designed to establish." (Syl. ¶ 2.)

Along the same line we had this to say in *State v. Poulos,* 196 Kan. 253, 411 P. 2d 694, cert. den. 385 U. S. 827, 17 L. Ed. 2d 64, 87 S. Ct. 63:

". . . If the evidence is relevant to the issue being investigated, the jury is permitted to receive it, unless some other rule of exclusion or privilege, as announced in Article 4 or other statutes, causes the evidence to be excluded. . . ." (p. 263.)

Finally, defendant contends the evidence is insufficient to support the verdict. Defendant points out that both DeWitt and Chase had records of mental illness and that there were considerable conflicts and a number of discrepancies in their testimony.

At the outset of our discussion on this point, it should be noted that the jury was fully and specifically instructed regarding the credibility of Chase and DeWitt as accomplices. No complaint was lodged concerning the instructions.

Even though there were discrepancies and contradictions between the two codefendant witnesses, and in some instances discrepancies with their previous testimony given at the pretrial hearing, these matters do not go to the admissibility but to the weight of the testimony which was solely within the province of the jury.

While there were several discrepancies in times, places and descriptions of events, on the main issue, Chase and DeWitt both testified that Roth took part in the planning of the crimes and, in fact, fired the fatal shots. The jury, under a proper precautionary instruction, chose to believe their testimony which was, if believed, entirely sufficient to support the verdict.

The law of this state with respect to the testimony of accomplices and the treatment thereof on appellate review was fully set out by Justice Parker speaking for the court in *State v. Peasley,* 179 Kan. 314, 295 P. 2d 627:

". . . Much of the argument on this point is based on the premise the evidence of the two accomplices, who testified to the effect appellant partici-

pated in the planning and commission of the crime in question, was either inadmissible or should not have been believed by the jury. The trouble with appellant's position on this point is that all arguments made with respect thereto refuse to recognize, wholly ignore and entirely overlook the long established decisions of this court holding that in criminal actions (1) the uncorroborated testimony of one accomplice, to say nothing of two, if otherwise sufficient, will sustain a conviction (See West's Kansas Digest, Criminal Law, §§ 508 to 510, incl.; Hatcher's Kansas Digest [Rev. Ed.], Criminal Law, § 288); (2) it is the function of the jury, not the court of appellate review, to weigh the evidence and pass upon the credibility of the witnesses (*State v. Osburn,* 171 Kan. 330, 232 P. 2d 451); and (3) where there is substantial competent evidence to support it a verdict of guilty will not be disturbed on grounds it is based on insufficient evidence or contrary to the weight of the evidence. (*State v. Stout,* 175 Kan. 414, 264 P. 2d 1056). (p. 318.)

The rules set out in *Peasley* have been consistently followed in many later cases, most recently in *State v. McLaughlin,* 207 Kan. 594, 485 P. 2d 1360, and *State v. Mae McLaughlin,* 207 Kan. 584, 485 P. 2d 1352.

In the instant case the jury saw and heard the able defense counsel — on cross-examination — point out to each of the two co-defendants the discrepancies in their own statements of what transpired, their credibility was fully tested for the benefit of the jury in weighing their testimony. After deliberating for twenty hours, the jury chose to believe the testimony on the main issue regardless of the inconsistencies. This was the jury's function and since there was ample evidence, if believed, to support the verdict, it cannot be disturbed on appellate review.

The judgment is affirmed.