No. 47,069

STATE OF KANSAS, *Appellee*, v. DENNIS M. SHEPHERD, JR., *Appellant*.

(516 P. 2d 945)

Opinion filed December 8, 1973.

*Charles D. Kugler,* of Carson, Mahoney & Fields, of Kansas City, argued the cause, and was on the brief for the appellant.

*Nicholas A. Tomasic,* district attorney, argued the cause and *Vern Miller,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a criminal action wherein Dennis Shepherd, Jr. (defendant-appellant), 17 years of age, was certified by the juvenile court of Wyandotte County, waiving its original jurisdiction, to the district court for trial on the charge of murder in the first degree (K. S. A. 1972 Supp. 21-3401) while perpetrating or attempting to perpetrate the felony of aggravated robbery (K. S. A. 1972 Supp. 21-3427). Upon trial to a jury he was found guilty and sentenced to the custody of the state penal director for life. (K. S. A. 1972 Supp. 21-4501 [a].) Appeal has been duly perfected raising the points hereinafter discussed.

Throughout all the proceedings in this case the appellant had either retained or appointed legal counsel to assist him.

The evidence disclosed the following facts.

During the early morning hours of June 19, 1971, a group of young men were assembled in a parking lot at the southern edge of Parkwood Park in Kansas City, Kansas. Parkwood is located

between Ninth and Tenth Streets with its southern edge on Quindaro Boulevard. At approximately one o'clock a. m. they heard shots and screams emanating from the park area north of them. Several members of the group ventured toward the noise to determine what had occurred. They found a young girl's body, subsequently identified as Geneva Flowers, aged 18. The police were immediately notified and an ambulance was summoned. The white blouse of the deceased was partially on her body and her slacks were down around her knees. Her underpants were found in place, but her bra was discovered 27 feet northeast of the body. Dr. Angelo Lapi, who performed the autopsy, testified there were four bullet wounds in the body and the cause of Miss Flowers' death was internal hemorrhage due to bullet wounds in the chest. The doctor performed an acid phosphatase test on the contents of deceased's vagina and determined semen was present. No determination was made as to when the semen had come in contact with the body. There was no indication of bruises or injury of any kind around the genital area of the body.

The metro squad, an assemblage of police officers from the metropolitan Kansas City area, was organized to investigate the murder. They quickly learned that between 12:00 p. m. and 1:00 a. m. the deceased arrived at a party with an individual named Ronnie Wilson. The party was being held at 2029 Valley in Kansas City, Kansas. Wilson testified when they arrived at the above address, the deceased changed her mind about attending, and stated she would walk to her apartment, located in a residential home one house from the northern corner of Tenth Street and Quindaro Boulevard. The distance from 2029 Valley to deceased's apartment is approximately one and a half miles and requires a fifteen to twenty minute walk. Wilson left Geneva Flowers to answer a phone call he had received. At that time she began walking, first in a southerly direction to avoid the dead-end street on Valley, and then presumably she turned north towards Tenth and Quindaro.

Within a few days the metro squad's investigation led to Willard Frye and Sandra Maggit, who lived in an upstairs apartment on the corner of Eleventh and Quindaro. On June 22, both gave statements regarding their knowledge of Geneva Flowers' murder. Frye testified during the trial he was acquainted with the appellant, age 17, and that he had talked with him about 11:30 p. m. June 18. At that time Frye was sitting in front of his apartment house on

the porch drinking beer. He said the appellant walked by and initiated a conversation by stating he needed some money and wanted to borrow some from Frye. At this point they saw a man standing on the street at the corner. The appellant wondered out loud whether the man had any money and then took some steps toward him. Frye said he told the appellant "no, don't do nothing like that." The appellant paid little attention and followed the man until he got in a car. Then the appellant returned to Frye's porch. They soon observed a girl walking down the street between Tenth and Eleventh wearing "light complected pants." The appellant started running down the street toward the girl, and told Frye he would return. In fifteen to twenty minutes the appellant called from across the street for Frye to go upstairs to his apartment. Soon the appellant arrived at the apartment where he joined Frye in the kitchen. Frye described the appellant as breathing hard, perspiring and carrying a brown, shiny leather purse. Upon examination they found the purse contained a long billfold, a watch, lipstick and a bank book with Geneva Flowers' name in it. There was also forty-five dollars (two twenties and a five) in the purse. The appellant kept twenty-five dollars and let Frye have twenty dollars. Frye told the appellant he had better get rid of the purse and the appellant asked Frye to do it. Frye took the purse to the trash barrel outside and set it on fire. When Frye returned the appellant was holding a black .22 caliber pistol with tape around the handle. The appellant then told Frye he had shot "that broad" in the arm, while raping her, because she pulled a .38 caliber pistol on him. Sandra Maggit testified that she had been lying in bed when the appellant and Frye went into the kitchen. Soon she went into the kitchen for a drink and observed the purse on the table. She removed earrings, watch, lipstick, makeup and put them in a drawer. While Frye was disposing of the purse, she testified the appellant told her he had raped the girl and shot her in both arms. After a short while the appellant decided he should leave, and since he planned to walk he asked Frye to keep the gun. The two mutually decided the appellant should not walk home, so Sandra ran across the street to a private club and had a waitress call a cab. While awaiting the cab, Frye saw an acquaintance driving by the apartment. Frye whistled and the friend, Donnell Moore, stopped the car. Moore agreed to give the appellant and Frye a ride. Moore picked up another person named Charles Tolefree on Seventh

Street. The appellant was let out at Fifth and Parallel and Frye returned to his residence.

At the trial Moore testified he did give a boy approximately "18 to 22" years of age a ride on June 19 at Frye's request, but he could not identify the boy. Tolefree related that he got into Moore's vehicle on the night of June 19. He stated that Frye and another individual occupied the back seat. At the preliminary hearing he identified the other passenger as being the appellant, but he could not positively identify him at the time of trial.

Maggit and Frye further testified the appellant returned to their apartment the following morning to pick up his gun. At that time the appellant told them the girl in the park had died, but neither Frye nor Maggit believed him.

After obtaining the statements of Maggit and Frye, the police analyzed the contents of the trash barrel behind Frye's apartment. The analysis turned up remnants of the purse. Based upon this evidence, around midnight of June 22, the police surrounded the home of the appellant's father located at Ninth and Quindaro and arrested the appellant as he walked out of the house. At that time the Miranda warning was read to the appellant with his father present, but the appellant made no statement.

The appellant was then placed in the custody of juvenile authorities. On the morning following his arrest an attorney was appointed to represent the appellant and he was interviewed concerning his activities on June 18 and June 19, 1971. At the time of the interview the appellant's father, his court appointed attorney, and various juvenile and police officers were present. The record does not disclose all that was said at the interview, but the appellant's brief suggests his statement was consistent with his testimony at the trial. Among the statements made by the appellant he said he owned a .22 caliber pistol, but sold the .22 pistol with black tape around the handle two or three weeks prior to June 19th. He said Frye had seen the gun on several occasions.

At the trial the appellant testified that on the night of June 18 he rode around with his cousin, Lindberg Robinson, and one Joe Caldwell. At one point they stopped at Paul Bunyan's for a hamburger. While there the appellant saw his father and borrowed $1.00 from him. Around midnight, while still riding, the appellant saw a friend named Al Wilson. After being taken home at 9th and Quindaro by his cousin, the appellant started walking down Quin-

daro to visit Wilson, but Wilson was not to be found so the appellant started the return trip home. Along the way he saw Willard Frye on his porch and stopped to talk. After two or three minutes of innocuous conversation the appellant testified he returned home, arriving there a little after 12:00 a. m. While the appellant and his brother James were watching television, the appellant's parents came in with some barbeque which the appellant and James readily consumed. The appellant claims he spent the rest of the night at home. Members of appellant's family support his testimony and Robinson and Caldwell corroborate his testimony insofar as it pertains to them.

On the 25th day of June, 1971, a waiver proceeding was conducted in the juvenile court of Wyandotte County to determine whether it should relinquish its jurisdiction to the district court pursuant to K. S. A. 1972 Supp. 38-808 (*b*). The juvenile court had before it a petition charging the appellant with an act of delinquency, alleging the charges. The record discloses considerable evidence was presented at the waiver proceeding. The testimony of Mr. Terry Showalter, the juvenile court probation officer, was heard concerning the appellant's juvenile court record of prior offenses and his status on probation. Further evidence disclosed the appellant's difficulties in school, his subsequent dropping out of school and his I. Q. The various facilities available to the juvenile court for the care, treatment and training of juvenile offenders, both public and private, were also explored by evidence in the record.

After hearing the matter the juvenile court recited that substantial evidence "has been adduced" and it found,

"3. That the child would not be amenable to the care, treatment and training program available through the facilities of the Juvenile Court and the child is not a fit and proper person to be dealt with under the Kansas Juvenile Code."

It was stipulated by the appellant's retained counsel at the waiver proceeding that the appellant's age was 17 years at the time of the offense, and that the charge alleged would be a felony under the general laws of the State of Kansas if committed by an adult.

Accordingly, the juvenile court entered an order waiving its original jurisdiction and directed the prosecuting attorney to proceed with prosecution of the appellant under the applicable criminal statute as an adult.

The appellant first contends the district court of Wyandotte

County lacked jurisdiction over him because he was improperly certified to stand trial as an adult.

This point is raised for the first time on appeal to this court. The order of the juvenile court waiving its original exclusive jurisdiction was never appealed to the district court. While the appellant concedes this to be true, he contends "that inasmuch as waiver to stand trial is a matter of jurisdiction", the Supreme Court may review the matter at any time, and that it may raise the jurisdictional question on its own motion (citing, *Leach v. Leach,* 184 Kan. 335, 336 P. 2d 425; and *In re Stephenson & Hudson,* 204 Kan. 80, 460 P. 2d 442).

On the posture of the case presently here for review the appellant's argument has no merit.

K. S. A. 1972 Supp. 38-808 (*b*) authorizes the juvenile court to waive its exclusive original jurisdiction in any hearing upon a petition alleging a child is, by reason of violation of a criminal statute, a delinquent child, as described in K. S. A. 1972 Supp. 38-802 (*b*) (1), when substantial evidence has been adduced to support findings that (1) the offense alleged is punishable as a felony under the general law; (2) the child was sixteen years of age but not over eighteen years of age at the time of the alleged commission of the offense; and (3) the child would not be amenable to the care, treatment and training program available through the facilities of the juvenile court. These three findings form the jurisdictional basis for the juvenile court's entering a valid waiver order. (*In re Templeton,* 202 Kan. 89, 92, 447 P. 2d 158.)

The foregoing three findings, which are a prerequisite to the entry of a valid waiver order by the juvenile court, are all based upon the determination of questions of fact. Here the appellant seeks to challenge only one of the factual determinations made by the juvenile court—that the appellant is not amenable to the care, treatment and training program available through the facilities of the juvenile court. In other words, the appellant attempts to make a collateral attack upon a finding of fact made by the juvenile court. This he cannot do collaterally. Jurisdiction may be defined as the power of the court to hear a matter. (*Fincher v. Fincher,* 182 Kan. 724, 324 P. 2d 159.) The test of jurisdiction is not a correct decision, but a right to enter upon inquiry and make a decision. Jurisdiction is not limited to the power to decide a case rightly, but includes the power to decide it wrongly. (*In re*

*Estate of Johnson,* 180 Kan. 740, 744, 308 P. 2d 100.) The juvenile court clearly had jurisdiction of the appellant. (K. S. A. 1972 Supp. 38-806.) A delinquent child, as defined by K. S. A. 1972 Supp. 38-802 (*b*) is a juvenile who does an act, which if done by an adult, would make him liable for a felony. The crime charged in this case is murder which obviously is a felony under K. S. A. 1972 Supp. 21-3105. The appellant was found to be within the county.

Furthermore, the juvenile court had jurisdiction of the subject matter, *i. e.,* certifying defendant to be tried as an adult in district court. K. S. A. 1972 Supp. 38-808 (*b*) specifically authorizes the juvenile court to waive its exclusive original jurisdiction upon a finding of the three jurisdictional facts.

Numerous Kansas cases state the fundamental rule that where a court has jurisdiction of the parties to an action and of the subject matter, and renders a judgment within its competency, even if erroneous, the judgment is final and conclusive unless corrected or modified on appeal or by such other method as may be prescribed by statute and it may not be attacked collaterally otherwise. (*In re Estate of Johnson,* supra; *In re Estate of Burling,* 179 Kan. 687, 694, 298 P. 2d 290; and cases cited therein.)

After hearing the evidence the juvenile court found the appellant was not amenable to the processes of the juvenile court. The adjudication of that litigated fact is just as conclusive as any other involved in the judgment, and it cannot be set aside except in a direct attack by appeal as was done in the case of *In re Patterson, Payne & Dyer,* 210 Kan. 245, 499 P. 2d 1131. (See, *In re Estate of Johnson,* supra; and *In re Wallace,* 75 Kan. 432, 89 Pac. 687.) In *Wallace* the court said:

". . . [W]hen a court passes upon a question of fact which it has a right to determine its erroneous decision of the question is not open to collateral attack. . . . Where jurisdiction depends on a fact that is litigated in a suit, and is adjudicated in favor of a party who avers jurisdiction, then the question of jurisdiction is judicially decided and the judgment record is conclusive evidence of jurisdiction until set aside or reversed by a direct proceeding. (*Bloom v. Burdick,* 1 Hill [N. Y.] 130, 138, 37 Am. Dec. 299.)" (pp. 435, 436.)

Where a juvenile disputes the correctness of a juvenile court's determination of the jurisdictional facts necessary to support an order waiving its jurisdiction, his only recourse is a direct appeal to the district court pursuant to K. S. A. 1972 Supp. 38-834, and thereafter to the Supreme Court if necessary.

The appellant contends the Juvenile Code statutes under which he was certified to the district court are unconstitutional because K. S. A. 1970 Supp. 38-826 discriminates against the appellant on the basis of sex. It is argued boys sixteen years of age or older are denied the equal protection of the laws by discriminating between boys and girls in this age group.

K. S. A. 1970 Supp. 38-826 in pertinent part provides:

". . . (a) When a child has been adjudged to be a delinquent child or a miscreant child under the provisions of this act, the judge of the juvenile court may make an order to:"

. . . . . . . . . . . . . . .

"(6) commit such child, if a boy thirteen (13) years of age or older to the state industrial school for boys or other training or rehabilitation facility for juveniles, if a girl thirteen (13) years of age or older to the state industrial school for girls or other training or rehabilitation facility for juveniles: *Provided,* That from the effective date of this act and until July 1, 1971, no boy sixteen (16) years of age or over shall be committed to the state industrial school for boys or other training or rehabilitation facility for juveniles unless such commitment has received the prior approval of the director of the division of institutional management."

The foregoing issue was not raised in the district court, and no opportunity was afforded the state to present evidence seeking to justify the treatment of sixteen and seventeen year old girls differently from boys of the same age. This court has previously held in the case of *In re Patterson, Payne & Dyer,* supra (p. 252), that it will not consider this question for the first time on appeal.

The appellant next contends the exclusion of jurors opposed to capital punishment denied him a trial by a representative impartial jury on the issue of guilt or innocence in violation of due process and equal protection. Nine jurors from a panel of 54 members were excluded at the outset for this reason. The appellant contends that a jury selected in this manner is naturally prosecution prone.

Appellant concedes this issue is not a novel question. (*State v. Washington,* 206 Kan. 336, 479 P. 2d 833; *Zimmer v. State,* 206 Kan. 304, 477 P. 2d 971; *Turner v. State,* 208 Kan. 865, 494 P. 2d 1130; *State v. Roth,* 207 Kan. 691, 486 P. 2d 1385; *State v. Campbell,* 210 Kan. 265, 500 P. 2d 21; *Bumper v. North Carolina,* 391 U. S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788.) The foregoing cases consistently hold the exclusion of jurors opposed to capital punishment will not be presumed to result in an unrepresentative jury on the

issue of guilt or to increase the risk of conviction in violation of constitutional standards. The burden of proof is upon the appellant to prove otherwise.

The appellant presented no evidence to support his claim. He argues common sense dictates that jurors not opposed to the death penalty are prosecution oriented. This argument cannot be accepted in light of the rule stated above. The appellant alludes to sociological surveys, cited in footnote ten of *Witherspoon v. Illinois*, 391 U. S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The United States Supreme Court described the data of those surveys as ". . . too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. . . ." (*Witherspoon v. Illinois*, supra; *Bumper v. North Carolina*, supra.) Failing to sustain his burden of proof, the appellant's claim is rejected.

The appellant next contends that uncorroborated accomplice testimony is insufficient to convict or sustain a conviction. It is argued Willard Frye and Sandra Maggit are accomplices and their testimony is uncorroborated in material parts.

Assuming, without deciding, that Frye and Maggit are accomplices the rule is stated in *State v. McLaughlin*, 207 Kan. 594, 485 P. 2d 1360, where the court said:

". . . [I]t has clearly been the established law in this jurisdiction for many years, as at the common law, that the uncorroborated testimony of an accomplice is sufficient to sustain a conviction. In *State v. McIntyre*, 132 Kan. 43, 294 Pac. 865, it was stated:

"'. . . it is now well settled that the uncorroborated testimony of an accomplice, if otherwise sufficient, will sustain a verdict of guilty. The credit to be given to the evidence is a matter for the determination of the jury. . . .' (p. 48.)

Other decisions stating law to the same effect are *State v. Carter*, 148 Kan. 472, 83 P. 2d 689; *State v. Wood*, 196 Kan. 599, 413 P. 2d 90; and see Hatcher's Kansas Digest, Criminal Law, § 288; and 30 Am. Jur. 2d, Evidence, § 1151, p. 327.

"In Kansas where the uniform rules of evidence have been adopted (effective January 1, 1964) it is to be noted that no statute requires an accomplice's testimony to be corroborated. It is for the jury to determine the credibility to be given to the testimony of the various witnesses called at the trial." (p. 598.)

The appellant argues that if the above rule is to exist, the jury should be more carefully instructed as to receiving such testimony than they were in the case at bar. Instruction No. 11 given to the jury reads:

"The State has introduced the testimony of Willie Frye and Sandra Maggit who have admitted taking certain items from the purse of Geneva Flowers knowing that it had been stolen. The testimony of such witnesses should be received with great caution, and should be carefully considered in the light of all the other evidence in the case and the circumstances under which their testimony was given in order to determine whether the purpose of the witness was to obtain some personal benefit or advantage or to gratify his malice."

The above instruction is substantially the same as the one requested by appellant, except that the trial court refused to add the phrase " 'also to shield from punishment.' " The appellant contends it was error to do so. The instruction given adequately cautioned the jury as to the weight to be given Frye's and Maggit's testimony. In giving the instruction the trial court overruled the state's objection that the words "should be received with great caution" were prejudicial to the state. Based upon the evidence adduced at the trial we find instruction No. 11 was proper. The trial court noted the only evidence implicating Frye and Maggit was that they knew the purse was stolen, but they did not know anything about the slaying until the next day.

The next point asserted by the appellant is that the court erred in allowing the state to introduce into evidence specific instances of appellant's conduct to show guilt of the offense charged in violation of K. S. A. 60-447.

The state called Deann Chatmon, an acquaintance of appellant, who testified that previous to June 19 she had seen appellant in possession of a small black .22 pistol with black tape around the handle. She related that on one occasion appellant held the gun to her head. The state then called Roger Knox, employed as a park patrolman, who stated that, in a conversation four days previous to the murder, the appellant admitted he had owned a .22 pistol with a taped handle but had recently disposed of it.

The appellant contends the above testimony constitutes specific instances of conduct tending to prove a bad trait of his character which relates to proving the offense charged without the accused having introduced evidence of his good character. The state maintains the testimony is relevant to bolster the testimony of Frye and Maggit concerning the .22 pistol and impeaches appellant's testimony that he had gotten rid of his .22 pistol three weeks prior to the murder.

Objection is made to the foregoing testimony for the first time on appeal. No objection was made at the trial.

K. S. A. 60-404 is a codification of this State's prior law and reads as follows:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence *unless there appears of record objection to the evidence timely interposed and so stated* as to make clear the specific ground *of objection.*" (Emphasis added.)

The rule was discussed in *Baker v. State*, 204 Kan. 607, 464 P. 2d 212 as follows:

"The contemporaneous objection rule long adhered to in this state requires timely and specific objections to the admission of evidence in order for the question of admissibility to be considered on appeal. (K. S. A. 60-404.) The rule is a salutary procedural tool serving a legitimate state purpose. (See, *Mize v. State*, 199 Kan. 666, 433 P. 2d 397; *State v. Freeman*, 195 Kan. 561, 408 P. 2d 612, cert. denied, 384 U. S. 1025, 16 L. Ed. 2d 1030, 86 S. Ct. 1981.) By making use of the rule, counsel gives the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial. Furthermore, the rule is practically one of necessity if litigation is ever to be brought to an end." (p. 611.)

The appellant next contends the trial court erred in permitting the prosecution to comment upon his reliance on constitutional rights. Appellant's complaint goes specifically to the testimony of Major Hall, and Officer Billings, both of the Kansas City, Kansas, police department, and to the county attorney's closing argument.

Major Hall testified he was present on June 23, 1971, when the appellant was arrested and that he advised the appellant, in his father's presence, of his constitutional rights. The prosecutor then asked:

"Question: Did he make any statement to you?
"Answer: He did not, sir."

Detective Billings was present in juvenile court on June 23 when the appellant was interviewed concerning his activities on the night of the murder. During this interview accusatory statements from Frye and Maggit were read to the appellant. While relating this information at the appellant's trial, the prosecutor concluded his examination of Billings with the following question.

"Question: Did Dennis Shepherd deny anything that was said in his statement or say that it wasn't true?
"Answer: Not in my presence."

Finally, during the course of his oral argument to the jury the county attorney said:

"So he [appellant] did not come out voluntary and say, 'I will tell you everything I know about it [the murder].' Just remember Major Hall's testimony."

The state argues all the proceding statements are justifiable because they were made to counteract the defense strategy. Throughout the trial the appellant sought to leave an impression with the jury that he voluntarily agreed to go with the police, and that he wanted to tell everything he knew about the incident at his first opportunity.

The simple answer to the confusing nature of the appellant's charge is that no objection was interposed by the appellant at the trial to any of the preceding statements. We are, therefore, precluded from reviewing the point on appeal.

The judgment of the lower court is affirmed.