James Willard PIERSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 63437.

Court of Criminal Appeals of Texas, En Banc.

Sept. 17, 1980.

On Rehearing April 29, 1981.

OPINION

PHILLIPS, Judge.

This is an appeal from a conviction for a capital murder. Punishment is death.

Appellant raises fifteen grounds of error. We deal only with his contentions that two prospective jurors were excused for cause in violation of his right to an impartial jury and due process of law under the Sixth and Fourteenth Amendments. See *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Because the record reflects that both jurors were improperly excused, we reverse appellant's conviction.

Prospective juror William Graham initially testified that he was opposed to the death penalty if he personally had to impose the penalty. The prosecutor then explained to Graham that the jury members did not assess the death penalty, but only answered three questions. If the jury answered all three questions "yes," the trial judge would assess punishment at death; if the jury answered any of the questions "no," the judge would assess punishment of life imprisonment.[1]

The prosecutor then informed Graham that in order to serve as a juror he would have to state under oath that the mandatory penalty of death or imprisonment for life would not affect his deliberation on any issue of fact. See V.T.C.A. Penal Code, § 12.31(b). The prosecutor inquired whether Graham could take the oath knowing that if the jury affirmatively answered the three special issues appellant would be sentenced to death. Graham responded:

A Are these the questions over here?

A Right.

A Can I read them?

Melvyn Carson Bruder, Dallas, for appellant.

Henry Wade, Dist. Atty., & Steve Wilensky & Robert Whaley, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

1. The questions, generally known as special issues, are set forth in Art. 37.071(b), V.A.C.C.P. as follows:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Q Sure.

A I don't see why I would have any difficulty answering those questions yes.

A Well, in other words, you are saying that you can answer them yes knowing that when you returned a yes answer to each of those questions, that mandatorily the Defendant is going to receive the death sentence.

A What I am saying is that if you successfully prove your case, I may very well have no alternative but to answer those questions yes.

A Well, the alternative would come in, do you see, in each of those questions, the yes answer would have to be beyond a reasonable doubt, do you see, from the evidence. Now, jurors will have a great deal of latitude. Sometimes people—because of their own personal feelings or prejudice, bias and interest in what is going to happen, can sway them one way or another, even subconsciously, do you see. That's where the oath comes in. You are saying that the mandatory sentence of life or death will not affect your deliberations on any finding of fact at all.

Now, if I understood you right when you started, you said you would not return a verdict that would result in a death sentence; is that right?

A I said I would be opposed to such a thing, yes. However, I don't want to be put in that position. That's what I said.

A Now, if you feel that way, and you don't want to be put in that position, there is no one going to force you to take this oath. That's exactly why I asked you that question.

Now, if you take that oath, now, you are bound by law and oath to God to do exactly what you said you would do. And if you get into a tight situation here, you haven't heard the evidence—

A Right.

Q But you know full well that a yes answer to each of those three questions is going to result in a death sentence, and you are going to know that it was a direct result of what you personally said and you put yourself in a position where you might be required to do the very thing that you say you don't want to do. And at that time I am suggesting to you that it might well affect your deliberations to some extent, because of your deep-seeded [sic] personal feelings there.

A I understand. That's why I wouldn't want to take the oath.

A That's what I am saying. If you have this feeling at this time, you haven't even heard any evidence, I am just saying to you I wouldn't think you would want to take that oath to not even know what kind of situation you are taking yourself in, because you have a strong, apparently a very strong personal feeling against returning a verdict that will result in a death sentence; is that right?

A Well, my reason is strictly selfish. I'm not opposed to death penalty if the crime warrants it. I do not want to be the one that would do it, and then later find that I have made some grievous error.

Q Well, but sure, there are a lot of people that will say I am not opposed to the death penalty if someone else does it.

A Yeah.

Q But that isn't—we are entitled—we who are representing the people here in Dallas County, State of Texas, all of those twelve persons on that jury that from start to finish will say "If you show it to me I will have no qualms at all about following the law—"

\* \* \* \* \* \*

Q (By Mr. Whaley) What I am saying is, we are entitled to twelve jurors that know at the outset that they can do without any question what the oath says, not any question in their mind going in. And I have a feeling from talking to you that yes, you would have a considerable reservation about returning a verdict that you knew was going to result in the death sentence. And that's going to be with you the rest of your life.

A Well, that's my feeling. I feel that I would be put in an untenable position, because by the nature of my job, I prosecuted maybe thirty people in the course

of my work. I have gone to Grand Juries, arraignments, worked closely with the U.S. Attorneys, and in no instance did I ever have a Defendant that was not guilty. The problem was proving it. So therefore, if you have a good case, and you prove your case, I would have no choice but to answer yes to these questions. And therein lies my problem, because I would be opposed to sending someone to their death.

A That's exactly what we are talking about, so your choice comes at this moment as to whether or not you would take this oath. If you say you wouldn't take that oath—

A I won't take the oath.

On examination by defense counsel, Graham explained why he could not swear that his deliberation on the facts would not be affected by the mandatory penalty of death or life imprisonment:

Well, I am saying that it's quite obvious if you have always had this in the back of your mind, you are going to take a much harder look at the evidence, and look for more reasonable doubt than you would otherwise. . . .

The state challenged Graham on the basis that he could not take the oath required by § 12.31(b), supra. The court sustained the state's challenge. Referring the court to his pre-trial motions, appellant objected that under the holding of *Witherspoon v. Illinois,* supra, Graham should not have been excluded. Appellant also objected that the § 12.31(b) oath unfairly restricted the jury's consideration of the three special issues set forth in Art. 37.071(b), supra. The objection was overruled.

Prospective juror Russell Wayne Massey testified in response to questions by the prosecutor that he did not think the death penalty was an appropriate penalty for crime. Massey further testified that he personally would not vote for the death penalty. Defense counsel explained to Massey that under the Texas procedure the jury did not itself impose the death penalty. Counsel then explained the § 12.31(b) oath to Massey. Massey initially stated that he could take the oath, then wavered:

Because I want to answer [the special issues] honestly, of course, and I would like to go by strictly the facts and answer all the facts honestly. And if everything by the facts came to the fact that I have to answer all three questions yes, I don't know if I want to take that oath.

Massey ultimately took the position that his personal feelings concerning the death penalty would not cause him to distort or disregard the facts of the case:

I would not let my personal feelings get involved to where I would, if I believed all three questions to be yes, I would say no.

\* \* \* \* \* \*

Q (By Mr. Evans [defense counsel]) Assuming you are on a jury in a capital case, I'm going to ask you one more time: If you would let the mandatory penalty of death or imprisonment for life affect your deliberations on any issue of fact in a case.

A If I was on the jury?

Q If, yes.

A Then I would have to put my personal feelings aside and go strictly by the facts, if I was on the jury.

Q And could you and would you do that?

A Well, see now, I've never been in that position, I really can't honestly say, but I think yes, I would go strictly by the facts and go strictly by the rules.

Q Well, what you are telling us is you would rather not be on the jury in the first place.

A Well, if by going strictly by the facts and strictly by the rules and going honestly to it, I could give a man the death sentence, yes, I do not want to be on the jury. I really don't know what to say.

The state's challenge for cause due to Massey's inability to take the § 12.31(b) oath was sustained. Appellant objected that the exclusion of Massey was contrary to the holding of *Witherspoon,* and that Massey appeared able to put aside his personal feelings and follow the law. The objection was overruled.

The United States Supreme Court held in *Witherspoon* that "a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." 391 U.S. at 521, 88 S.Ct. at 1776. Specifically, the Court held that:

> ... a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. [footnote omitted]

*Id.* at 522, 88 S.Ct. at 1777. The Supreme Court subsequently established that the improper exclusion of even one juror requires that the death sentence not be imposed. *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 399 (1976).

The Supreme Court recently addressed the question whether the application of § 12.31(b), supra violates the mandate of *Witherspoon.* *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). *Adams* makes it clear that a literal application of the language of § 12.31(b) is unacceptable under *Witherspoon.* The Court stated:

> Based on our own examination of the record, we have concluded that § 12.31(b) was applied in this case to exclude prospective jurors on grounds impermissible under *Witherspoon* and related cases. As employed here, the touchstone of the inquiry under § 12.31(b) was not whether putative jurors could and would follow their instructions and answer the posited questions in the affirmative if they honestly believed the evidence warranted it beyond reasonable doubt. Rather, the touchstone was whether the fact that the imposition of the death penalty would follow automatically from affirmative answers to the questions would have any effect at all on the jurors' performance of their duties. Such a test could, and did, exclude jurors who stated that they would be "affected" by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally. Others were excluded only because they were unable positively to state whether or not their deliberations would in any way be "affected." *But neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty.* The grounds for excluding these jurors were consequently insufficient under the Sixth and Fourteenth Amendments. *Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt.* Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law. [footnotes omitted] [emphasis added]

*Id.,* 100 S.Ct. at 2528–2529.

Under *Adams* no prospective juror may be excluded simply because he states that his view of the facts or law would be "affected" by the possible infliction of the death penalty. Nor may a prospective juror be excluded because the possible infliction of the death penalty would involve him emotionally or cause him to deliberate upon the issues with greater seriousness than he would otherwise. A prospective juror may be excluded consistent with *Adams* if he indicates that he could not follow the court's instructions or obey his oath to ren-

der a verdict according to the law and evidence. See the underlined portion of the quotation above; see also 100 S.Ct. at 2529. In order to establish a challenge for cause the state must go beyond the statutory language of § 12.31(b) and show that because of the prospective juror's feelings against the death penalty he would be unable to answer the special issues without engaging in a "conscious distortion" of the facts or law. *Id.*, 100 S.Ct. at 2526. When a juror engages in such conscious distortion, he ignores his instructions concerning the special issues, and violates his oath to render a true verdict according to the law and evidence. See Art. 35.22, V.A.C.C.P.

■ In the present case both Graham and Massey stated that in spite of their reservations about the death penalty, they could answer the special issues in the affirmative if the state proved its case. It is true that Graham testified he would "take a much harder look at the evidence, and look for more reasonable doubt" than he would otherwise. *Adams* points out, however, that a prospective juror cannot be excluded because he concedes that the prospect of the death penalty may affect his view of what constitutes a reasonable doubt. See the underlined portion of the quotation above. Under *Adams*, prospective jurors who take such a serious attitude but who nonetheless state that they can honestly determine the facts and abide by the law may not be excluded from jury service.

Prospective jurors Graham and Massey were excluded from serving on the jury in violation of the holdings in *Witherspoon* and *Adams*. Their exclusion from service denied appellant his right to an impartial jury under the Sixth Amendment and due process of law under the Fourteenth Amendment.

■ Appellant objected to the exclusion of both Graham and Massey. Although the record reflects that the state failed to use five of its 15 peremptory challenges, we do not view this as rendering the error harmless.

First, under the statutory procedure established for capital cases, the prospective jurors in this case were examined and challenged on an individual basis. See Arts. 35.13, 35.17, 35.20, and 35.25, V.A.C.C.P. Had the court been overruling the state's challenges for cause in a manner consistent with *Adams* and *Witherspoon*, we cannot say with any assurance that the state would have exercised a peremptory challenge against either Graham or Massey. The state may well have considered that taking one or both of them was preferable to using peremptory challenges and thereby enhancing the possibility of being forced to accept an even less desirable juror.

■ Second, there is no showing that the trial court would have allowed the state to exercise its peremptory challenges retroactively. Such action would be manifestly improper under the established procedure for selecting a jury in a capital case. *Grijalva v. State*, 614 S.W.2d 420 (1980). Prospective jurors in capital cases are examined individually and must be challenged and passed upon separately. Arts. 35.13 and 35.20, supra. Only in non-capital cases do the parties exercise their peremptory challenges after having conducted a voir dire examination of the entire jury panel. Arts. 35.25 and 35.26, V.A.C.C.P.; see *Fuller v. State*, 409 S.W.2d 866, 869 (Tex.Cr. App.1966). If the state elects to seek the death penalty, it must select the jury in accordance with the procedure established for capital cases. It may not seek to take advantage of the procedures for both capital and non-capital cases.

All things considered, it would be pure speculation on our part to hold that the state's failure to exhaust its peremptory challenges rendered harmless the error in excluding Graham and Massey. We refuse to engage in speculation concerning an issue as significant as the selection of a fair and impartial jury in a capital case where the death penalty is assessed. The error was not harmless.[2]

2. We note that the United States Supreme Court has summarily reversed several state decisions, including a decision of this Court, that held error under *Witherspoon* was harmless or

The judgment is reversed and the cause remanded.

## OPINION TO OVERRULE STATE'S MOTION FOR REHEARING

TEAGUE, Judge, concurring.

Oftentimes, the decisions this Court renders are far from being classified as popular. This is understandable for it is the rare case that comes before the Court where this Court can publish an opinion that is totally and wholly acceptable by all parties before it, and also by persons who chance to read the opinion. The cases handled by this Court are a long way from "adoption" type causes, but are cases many times evoking a great deal of emotion and discussion among the electorate citizenry who are, interestingly by law, our constituents.

I concur by written opinion in this cause because in my view the dissent opts for reaching the popular, though pragmatic result. There is absolutely no question Judge McCormick's well-written opinion resembles in many respects something almost irresistible, like the siren of the mermaid Lorelei. However, after spending many hours rationalizing, analyzing, agonizing, and meditating over what is the proper legal decision to make, I have concluded that what the dissent asks of this Court is for it to act legislatively, which would unquestionably be the popular thing to do in this type cause. However, that is not our function under the Constitution and laws of this State. We must never forget the very simple fact that our government is divided into three equal departments: the executive, the legislative, and the judiciary, as well as the additional fact that it is our sole function to interpret the law and not replace the proper department whose sole function is to pass our laws, even if in doing so we render an unpopular decision. We are only one of the three equal coordinating divisions of our government and must religiously accept that fact of life, as I believe the members of this Court do.

As a result of a decision by the Supreme Court of the United States in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), decided by a vote of 8–1, that Court, in rendering as unpopular a decision as we do today, struck down a death penalty conviction from the State of Texas, which this Court had *unanimously* sustained, at a time when I was not a member of the Court. The Supreme Court held in *Adams, id.,* that (1) the exclusion of prospective jurors on the ground that they were unwilling or unable to take the statutory oath to the effect that a mandatory penalty of death or life imprisonment would not have affected their deliberations on any issue of fact contravened the sixth and fourteenth amendments to the United States Constitution, and (2) the State of Texas could not execute a sentence of death imposed by a jury from which such prospective jurors had been excluded.

As a result of that decision, due to the Supremacy Clause of the United States Constitution, see Art. VI, it is now our duty to decide the applicability of *Adams,* supra, to cases, such as this one, presently before this Court. It is unanimously agreed by the members of this Court that as a result of

waived. *Whan v. Texas,* 403 U.S. 946, 91 S.Ct. 2281, 29 L.Ed.2d 856 (1971), rev'g *Whan v. State,* 438 S.W.2d 918 (Tex.Cr.App.1969); *Speck v. Illinois,* 403 U.S. 946, 91 S.Ct. 2279, 29 L.Ed.2d 855 (1971), rev'g *People v. Speck,* 41 Ill.2d 177, 242 N.E.2d 208 (1968); *Wigglesworth v. Ohio,* 403 U.S. 947, 91 S.Ct. 2284, 29 L.Ed.2d 857 (1971), rev'g *State v. Wigglesworth,* 18 Ohio St.2d 171, 248 N.E.2d 607 (1969); *Bernette v. Illinois,* 403 U.S. 947, 91 S.Ct. 2290, 29 L.Ed.2d 858 and *Tajra v. Illinois,* 403 U.S. 947, 91 S.Ct. 2291, 29 L.Ed.2d 858 (1971), rev'g *People v. Bernette,* 45 Ill.2d 227, 258 N.E.2d 793 (1970); *Funicello v. New Jer-* sey, 403 U.S. 948, 91 S.Ct. 2278, 29 L.Ed.2d 859 (1971), rev'g *State v. Forcella,* 52 N.J. 263, 245 A.2d 181 (1968); *Childs v. North Carolina,* 403 U.S. 948, 91 S.Ct. 2278, 29 L.Ed.2d 859 (1971), rev'g *State v. Childs,* 269 N.C. 307, 152 S.E.2d 453 (1967). Of these cases, *Whan, Speck, Wigglesworth,* and *Bernette* relied in whole or in part on the argument that *Witherspoon* error was harmless because the state failed to exhaust its peremptory challenges. The Supreme Court's summary treatment of these cases indicates that the capital defendant's right to a fair and impartial jury is not readily forfeited.

the *Adams'* error, this conviction cannot be affirmed and the error on that point must be sustained. It is also unanimously agreed by the members of this Court that the trial appellant received, except for the selection of the jury, is facially an error free trial.

There lies the nub, and the logical questions: (1) do we reverse the cause for a completely new trial or, as said in some quarters, "Do we let the defendant have the whole nine yards again?" or (2) do we partially reverse for a new trial on the issue of punishment, empaneling a new jury to decide only that issue or (3) do we reform the judgment to provide that the conviction is affirmed, but the sentence of death is reformed to life imprisonment?

Of course, the most popular option, and unquestionably the one that would be the most pleasing to many of our constituents, is the third one. But, we do not decide cases on the basis of what decision we might make would be the most popular one, for if we did we would shortly cease to exist as an independent judiciary, which we are, and also cease to exist as an equal to the executive and legislative branches of our state government, which we are.

Though the above is what I have characterized as "logical" options, unfortunately, something said to be a "logical" option is not necessarily synonymous with a "legal" option.

I, for one, believe Judge McCormick recognizes this, but at the same time he is apparently pleading for a pragmatic result by his well-written and appetizing dissenting opinion, for he concludes with the following statement:

  \*   \*   \*   \*   \*   \*

 Perhaps today's decision will ring the death knell for the rule requiring a complete retrial of guilt when an error has occurred at the sentencing stage. *The Legislature can, and should, immediately remedy by amendment the law that allows a lawfully convicted felon another*

*trial when there was no constitutional infirmity in the verdict that found him guilty.*[1]

  \*   \*   \*   \*   \*   \*

*Our legal options,* it is sad to say, due to lack of legislative action, are no better today than in 1972 when, as a result of *Branch v. Texas,*[2] 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court of the United States struck down many convictions from Texas for a similar reason as they did in *Adams,* supra.

In 1972, this Court was confronted with an almost identical issue as the one now before us. A similar, if not the same argument made by the dissent was unanimously rejected by this Court at that time.

In *Ocker v. State,* 477 S.W.2d 288 (Tex. Cr.App.1972), a case that did not reach the Supreme Court, Judge Roberts speaking for this Court said:

  \*   \*   \*   \*   \*   \*

 We note that the State has filed a motion in this Court requesting permission to withdraw its notice of intent to seek the death penalty and moving this Court to assess the punishment in this cause at imprisonment *for life.* The State has cited numerous cases from other jurisdictions in which appellate courts have reduced the punishment assessed by the trial court. We have examined those cases cited by the State, and have concluded that they have no application to the case at bar. In those cases, the court either followed a rule of that particular jurisdiction which permitted modification of the lower court sentence, or acted pursuant to a statute specifically authorizing the appellate court to modify sentences.

 We are also aware of the solution found by the Supreme Court of New Jersey in cases such as this. In that State, if the prosecutor agrees to waive the death penalty after the punishment has been assessed, but while the case is on appeal, the Supreme Court may modify the sen-

---

**1.** All emphasis is supplied throughout hereinafter by the writer of this opinion unless otherwise indicated.

**2.** Sub nom., *Furman v. Georgia.*

tence and assess punishment at imprisonment for life. *State v. Conyers*, 58 N.J. 123, 275 A.2d 721 (1971); *State v. Royster*, 57 N.J. 472, 273 A.2d 574 (1971); *State v. Laws*, 51 N.J. 494, 242 A.2d 333 (1968) cert. denied, 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968). We do not feel that the New Jersey solution is permissible under our law.

*This Court has long held that it may not reduce the punishment assessed by the jury.* E. g., *Johnson v. State*, 447 S.W.2d 927 (Tex.Cr.App.1969); *Darden v. State*, 430 S.W.2d 494 (Tex.Cr.App.1968); *Broadway v. State*, 418 S.W.2d 679 (Tex. Cr.App.1967); *Ellison v. State*, 419 S.W.2d 849 (Tex.Cr.App.1967); *Mason v. State*, 375 S.W.2d 916 (Tex.Cr.App.1964); *McGruder v. State*, 377 S.W.2d 191 (Tex. Cr.App.1964); *Hunt v. State*, 167 Tex. Cr.R. 51, 317 S.W.2d 743 (1958); *Garcia v. State*, 166 Tex.Cr.R. 482, 316 S.W.2d 734 (1958); *Bell v. State*, 166 Tex.Cr.R. 340, 313 S.W.2d 606 (1958); *Suit v. State*, 161 Tex.Cr.R. 22, 274 S.W.2d 701 (1955); *Treadwell v. State*, 159 Tex.Cr.R. 182, 262 S.W.2d 201 (1953); *Pineda v. State*, 157 Tex.Cr.R. 609, 252 S.W.2d 177 (1952); *Knight v. State*, 148 Tex.Cr.R. 236, 186 S.W.2d 350 (1945); *Brown v. State*, 16 Tex. 122 (1856).

This Court may reform a sentence so as to conform to the judgment and may reform a judgment to conform to the verdict of the jury. *However, except where the penalty is absolutely fixed by law or where the sentence fails to apply the indeterminate sentence law (Art. 42.-09, Vernon's Ann.C.C.P.), this Court may not pass sentence.*

We feel that our situation differs from that of New Jersey. In New Jersey, the punishment for murder in the first degree (the offense in the cases cited) is either death or life imprisonment, depending upon the verdict of the jury. N.J.S.A. 2A:113–4. If the jury chooses to recommend life imprisonment, there is no other punishment which may be assessed. Therefore, if a defect pertains to only the imposition of the death penalty, the appellate court, in reducing the sentence, is not performing a function which is properly reserved for the jury. In the present case, however, the jury was not faced with a choice between one of only two alternatives. Art. 1189, Vernon's Ann. P.C. provides: 'A person guilty of rape shall be punished by death or by confinement in the penitentiary for life, or for any term of years not less than five.' Thus, unlike New Jersey, the alternative punishment is not fixed by law, but encompasses a wide range. If this Court were to reduce the sentence to life imprisonment, we would be assessing punishment as we saw fit, not as required by law. We would be performing a function which properly belongs to the jury. If our statutes provided for a fixed punishment in lieu of the death penalty, the situation would be closely akin to the cases in which the punishment is absolutely fixed, and in which this Court has assessed punishment.

Also, unlike states which have statutory power to modify judgments, our statute provides: *'The Court of Criminal Appeals may affirm the judgment of the court below, or may reverse and remand for a new trial, or may reverse and dismiss the case, or may reform and correct the judgment, as the law and nature of the case may require.'* Art. 44.24, V.A.C. C.P. *Thus, the statute does not provide for modification of punishment, nor do we feel that it may be inferred.* In that the statute provides for reformation and correction, we feel that we are limited to those powers. (Art. 5, § 5 of the Texas Constitution, Vernon's Ann.St. restricts the jurisdiction of this Court to the extent provided by statute.)

*We also feel that we may not remand this case for assessment of punishment only.* Art. 37.07(3)(c) provides, 'In the event the jury shall fail to agree, a mistrial shall be declared, the jury shall be discharged, and no jeopardy shall attach.' If the punishment was erroneously imposed, then the case stands in the same position as if the jury had failed to reach a verdict. While this court may remand

for assessment of punishment where the punishment was originally set by the court, we may not do so where the original punishment was set by the jury.

*While the power to reduce or modify sentences may be desirable, see American Bar Assn. Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences, Approved Draft 1968, we do not feel that we are able, or should effect such a procedure without legislative approval.* (footnotes omitted) *Id.* at 289

\* \* \* \* \* \*

In a pre-*Branch*, supra, case, Presiding Judge Onion speaking for this Court said in *Grider v. State*, 468 S.W.2d 393, 400 (1971), in very succinct fashion:

\* \* \* \* \* \*

The reversible error presented by this cause relates to penalty only. The State has sought the death penalty which only a jury may impose. For the reasons stated in *Ellison v. State*, 432 S.W.2d 955 ([Tex.Cr.App.] 1968), '[t]his court is without authority to direct a new trial before a different jury *on the issue of punishment only.*' Cf. *State v. Ruth*, 276 N.C. 36, 170 S.E.2d 897. *Id.* at 400.

\* \* \* \* \* \*

In *Ellison*, supra, former Presiding Judge Woodley, now deceased, in speaking for this Court long before *Branch* but after *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), was decided, said:

\* \* \* \* \* \*

Our statute provides that the Court of Criminal Appeals may affirm the judgment of the court below, or may reverse and remand for a new trial, or may reverse and dismiss the case, or may reform and correct the judgment as the law and nature of the case may require. Art. 44.24 V.A.C.C.P.

Also, Art. 44.29 V.A.C.C.P. provides: 'Where the Court of Criminal Appeals awards a new trial to the defendant, the cause shall stand as it would have stood in case the new trial had been granted by the court below.'

*It follows that this court is without authority to direct a new trial before a different jury on the issue of punishment only. Id.* at 957.

\* \* \* \* \* \*

In *Turner v. State*, 485 S.W.2d 282 (1972), Judge Odom speaking for this Court said:

\* \* \* \* \* \*

The question now before this court is the proper disposition of this case in light of ... Texas law. A commutation of appellant's sentence by the Governor would have satisfied the mandate of the Supreme Court. *Whan v. State*, 485 S.W.2d 275 (1972). However, commutation has not been sought or granted in the instant case.

*The options available to this court in a case where a sentence is defective are quite limited. We may reform: (1) a sentence so as to conform to the judgment; (2) a judgment to conform to the jury's verdict; (3) a sentence which fails to apply the penalty fixed by law; or (4) a sentence which fails to apply the indeterminate sentence law (Article 42.09, Vernon's Ann.C.C.P.).*

*However, this court is without authority to either pass sentence or reduce the punishment assessed by a jury. Ocker v. State*, Tex.Cr.App., 477 S.W.2d 288. *And, while we may remand solely on the issue of punishment where punishment was originally assessed by the court, we may not do so where punishment was assessed by the jury.* (footnotes omitted) *Id.* at 283.

\* \* \* \* \* \*

In *Harris v. State*, 485 S.W.2d 284, 285 (1972), Judge Tom Davis speaking for this Court said:

\* \* \* \* \* \*

*This Court is without authority to either pass sentence or reduce the punishment assessed by a jury. Turner v. State*, 485 S.W.2d 282 (1972); *Ocker v. State*, Tex.Cr.App., 477 S.W.2d 288. *We cannot remand solely on the issue of punishment where punishment was assessed*

*by the jury. Ellison v. State*, Tex.Cr. App., 432 S.W.2d 955.

The United States Supreme Court having found that punishment was erroneously imposed in this cause, its status is the same as if the jury had been unable to agree on a verdict. *Turner v. State*, supra; *Ocker v. State*, supra. *Id.* at 285.

\* \* \* \* \* \*

There is no question that appellant's jury in this cause was contaminated; contaminated in the sense that he received a jury from which prospective jurors had been unlawfully excluded. Under *Adams*, supra, no prospective juror may be excluded simply because he states that his view of the facts or law would be "affected" by the possible infliction of the death penalty. In this cause, two prospective jurors were excluded from serving on the jury in violation of the holdings of *Witherspoon* and *Adams*, supra.

In a sense, there can never be an error free trial where a jury is unlawfully selected because the unlawful selection of that jury has infected the entire trial, although from the face of the trial record, as to the guilt-innocence of the defendant, the trial may be free of common trial errors. A jury that is unlawfully selected is inherently not a dispassionate jury. For example, a trial where a jury was selected from a panel from which members of the accused's race were excluded, may facially constitute an error free trial, but it could not be argued that the accused received the fair and impartial trial to which the law demands he have. Surface-wise, such a trial would have no ascertainable defects, due to the cosmetic appearance of the trial record, but depth-wise the unlawful selection of the jury stigmatizes the whole trial. "Due process requires a competent and impartial jury." See *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). "Proof of actual harm, or lack of harm, is virtually

impossible to adduce." *Peters, id.*, 407 U.S. 504, 92 S.Ct. 2169, 33 L.Ed.2d 94. Such a defendant in that instance would have been convicted by a tribunal that fails to satisfy the elementary requirements of due process and due course of law under our constitutions.

It may, therefore, be that even where a trial is facially an error free trial, the defendant may still be entitled "to the whole nine yards." [3] However, I pretermit a discussion of that issue for another day as today we must, in the colloquial, "Give the defendant the whole nine yards," and grant him a totally new trial even though facially the error does not go to guilt, but only to punishment.

However, I wholeheartedly agree with Judge McCormick's suggestion that as the legislature is now in session, a law should be enacted to give this Court an additional legal option in such cases as here.

I therefore, concur to overruling the State's motion for rehearing without written opinion for the above stated reasons.

McCORMICK, Judge, dissenting.

On original submission, appellant's conviction was reversed on the basis of the United States Supreme Court's holding in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). This Court further ordered the cause remanded to the trial court. Today, the majority overrules the State's motion for rehearing without written opinion.

In its motion for rehearing, the State urges that reversal due solely to *Adams* error should not automatically require a remand to the trial court, but that this Court has authority to reform the judgment to life imprisonment whenever the State certifies that such would be in the best interest of justice. This argument is predi-

---

**3.** In this regard, it is observed that due to the fact a jury being selected to hear a capital murder case will undoubtedly be examined by the parties on the possible lesser included offense of murder, see Art. 37.09, V.A.T.C.C.P., the punishment for which is life or any term of not more than 99 years or less than five years and a possible fine not to exceed $10,000, see V.T.C.A. Penal Code, Secs. 19.02 and 12.32, at least initially the jury to be selected in a capital murder case is not necessarily one qualified to assess a punishment fixed by law, but is actually a jury qualified to assess a rather broad range of punishment.

cated on the proposition that, since *Adams* or *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), errors only prohibit the execution of a sentence of death and does not render the finding of guilt invalid, this Court may reform the sentence to life since that is the only other punishment available for the offense committed. The State is correct in this contention, and the motion should be granted.

## I.

In *Witherspoon v. Illinois*, supra, the Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. 391 U.S. at 522, 88 S.Ct. at 1777. In so holding, the Court made it abundantly clear that its decision did not "render invalid the *conviction*, as opposed to the *sentence*, in this or any other case." 391 U.S. at 522, fn. 21, 88 S.Ct. at 1777, fn. 21. (Emphasis added)

In *Adams v. Texas*, supra, the Court held that the provisions of V.T.C.A. Penal Code, Section 12.31(b), could not constitutionally coexist with *Witherspoon*, and, based on *Witherspoon*, held:

"... Accordingly, the Constitution disentitles the State to *execute a sentence of death* imposed by a jury from which such prospective jurors have been excluded.

"The judgment of the Texas Court of Criminal Appeals is consequently reversed *to the extent that it sustains the imposition of the death penalty*." 100 S.Ct. at 2529. (Emphasis added)

Clearly, these two decisions leave to the states the proper procedure to be followed when a death penalty must be set aside. Several other jurisdictions whose laws provide only for death or life imprisonment as the punishment for a specified crime have determined that a proper remedy to be utilized when the jury selection in a capital case is infected by *Witherspoon* error is to reduce the punishment of death to life imprisonment. See, *State v. Laws*, 51 N.J. 494, 242 A.2d 333 (1968), cert. denied, 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968); *Zimmer v. State*, 206 Kan. 304, 477 P.2d 971 (1970); *State v. Sherrick*, 105 Ariz. 514, 467 P.2d 908 (1970); *Hawkins v. Rhay*, 78 Wash.2d 389, 474 P.2d 557 (1970); *Segura v. District Court*, 179 Colo. 20, 498 P.2d 926 (1972).

I think it also significant to note here that at least two jurisdictions who were faced with this issue but whose laws provided for alternative punishments in addition to life or death have rejected the reformation argument but only because there existed more than one alternative. Following the decision of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court of Virginia, in setting aside a death penalty conviction, noted that the punishment could not be reformed to life imprisonment because a third alternative, 99 years' imprisonment, was available. *Hodges v. Commonwealth*, 213 Va. 316, 191 S.E.2d 794 (1972). In reaching that decision, the court refused to follow the California Supreme Court, *People v. Anderson*, 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880 (1972), and reform the punishment to life because in California only life or death was available and "[n]o such restrictive penalty provisions, however, obtain in Virginia."

Similarly, in *Beaver v. State*, 475 S.W.2d 557 (Tenn.Cr.App.1971), the Tennessee Court of Criminal Appeals, in remanding the appellant's case for a new hearing on punishment only, stated:

"Had we not the variety of punishment for first degree murder (from over twenty years, to life, to execution), T.C.A. § 39–2405, we could simply substitute the alternative to death (usually, in other jurisdictions, life imprisonment) and enter judgment accordingly, if the State did not insist upon again seeking the death penalty." *Beaver v. State*, at 560.

I conclude, as have other jurisdictions, that where error occurs in the assessment of a death penalty which would prohibit its imposition, if there is but one other punishment which could be given, i. e. life impris-

onment, there exists no constitutional infirmity in reforming the punishment. *State v. Laws*, supra.

## II.

It being well established that a death penalty which was infected with *Witherspoon* error may be reformed to life imprisonment where that is the only other available punishment, I proceed to consider whether existing Texas law will allow the same result. Such is not an issue of first impression before this Court.

In 1972, this Court held in *Ocker v. State*, 477 S.W.2d 288 (Tex.Cr.App.), that a death penalty secured in violation of *Witherspoon* could not be reformed to life. In so holding, this Court noted that the holdings of the Supreme Court of New Jersey could not be applied in Texas because, "in New Jersey the punishment for murder in the first degree . . . is either death or life imprisonment depending upon the verdict of the jury." Under the statutes then in effect in this State, the alternatives to punishment in capital cases also included a term of years. Since, at that time, the alternative punishment was not fixed by law, the cause was remanded.

The Court went on to say that:

"If our statutes provided for a fixed punishment in lieu of the death penalty, the situation would be closely akin to the cases in which the punishment is absolutely fixed, and in which this Court has assessed punishment." *Ocker*, at 290.

With the passage of the 1974 Penal Code, the situation is now identical to the New Jersey cases. Appellant having been found guilty of capital murder, the only punishment that could have been imposed was either life imprisonment or death. Article 37.071, V.A.C.C.P.

Article 44.24, Subsection (b), V.A.C.C.P., provides that:

"The Court of Criminal Appeals may affirm the judgment of the court below or may reverse and remand for a new trial or may reverse and dismiss or *may reform and correct the judgment as the law and the nature of the case require.*" (Emphasis added)

It has been suggested that this Court is without authority to reform a death penalty to life imprisonment in that such would be an usurpation of the constitutional power of a jury and would amount to a reformation of a verdict, which is prohibited. Such a contention was rejected by the Supreme Court of Colorado in *Segura v. District Court*, 179 Colo. 20, 498 P.2d 926 (1972). In overruling the appellant's contention that a different punishment could only be determined by a jury, the Colorado Court held that substituting a life sentence for death was nothing more than a ministerial act that "imposed the judgment which would have been imposed had the jury [selected in violation of *Witherspoon*] in fact returned the only verdict it was qualified to return under the circumstances." *Segura v. District Court*, supra, 498 P.2d at 928–929.

This Court has stated that "except where the penalty is absolutely fixed by law" it may not pass sentence. *Ocker v. State*, supra, at 290. Further this Court has held that when a juvenile is found guilty of capital murder and since V.T.C.A. Penal Code, Section 8.07(d), disallows the punishment of death, the trial court may properly remove the sentencing authority from the jury and assess the punishment at life imprisonment since that is the only punishment available. *Allen v. State*, 552 S.W.2d 843 (Tex.Cr.App.1977).

Since life imprisonment is the only punishment which could be entered on the judgment in this case, I hold that, where the only error which occurs in a capital case affects the imposition of the penalty of death, this Court may properly reform the judgment to reflect the punishment to be life imprisonment.

In so concluding, I am not unaware of the argument that such a reformation would invade upon the role and power of the jury and that this Court is without authority to reform a verdict. Not only has that argument been rejected elsewhere, *Laws* and *Sequra*, supra, it overlooks the unique procedures employed in a capital case in Texas.

Under Article 37.071, V.A.C.C.P., the jury does not assess punishment. Punishment is set by the court based upon the jury's answer to special issues. Article 37.071(e), V.A.C.C.P. Furthermore, pursuant to Article 44.24, V.A.C.C.P., this Court may "reform and correct the judgment, as the law and nature of the case may require." Under Article 42.01, V.A.C.C.P., the term "verdict" as used in Sections (1),(7)–(1),(8), clearly refers to the decision of the jury as to guilt or innocence. A reformation of the punishment in cases such as the one before us would only affect Section (1),(10) of Article 42.01, relating to the punishment "as has been determined."

### III.

Having recognized that *Witherspoon* and *Adams* error do not affect the determination of guilt, and having also determined that this Court has authority to reform a death penalty to life imprisonment, I now turn to the contention of the State that such reformation should occur only when the State certifies that the interests of justice would best be served thereby or that, absent such certification, the cause should be remanded to the trial court for a complete retrial where the death penalty would again be a possible punishment. As stated in *Grijalva v. State*, 614 S.W.2d 420 (1980), the error presented here is not such as to prevent the State from retrying the defendant and seeking the death penalty. If the State certifies to this Court that it no longer desires to seek the death penalty, should not this Court recognize that "waiver" and reform the punishment to life—the only punishment available when the State has, through its discretion, removed death as a possible punishment? Such an approach would not be novel. would not be novel.

In an almost identical situation, the New Jersey Supreme Court concluded that, even absent specific authority for the State to waive the death penalty, a death penalty conviction infected with error relating to punishment only could be reformed where the prosecution makes known it would not seek death on retrial. *State v. Laws*, 51 N.J. 494, 242 A.2d 333 (1968), cert. denied, 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968). Such a waiver could, the court noted, be effected by the prosecution's seeking an indictment for a lesser offense; by accepting a plea negotiation for a lesser offense; or by proceeding to trial on a lesser offense. "As a practical matter, whenever the prosecutor decides not to ask for the death penalty he may so tell the jury and that effectively eliminates its return." *Laws*, 242 A.2d at 343.

As in *Laws*, it would be "utterly wasteful and needlessly burdensome to conduct the trial as though it were a capital case" if the State does not seek the death penalty. "Here there was a legal error to the sentence alone and the prosecutor, assuming as we find that a new trial on punishment alone is unavailable, seeks modification rather than retrial; in effect the death penalty is being waived. It undoubtedly could have been waived before and during the trial and there is no rational basis for denying the power to waive now." *Laws*, 242 A.2d at 342. See also, *State v. Sherrick*, 105 Ariz. 514, 467 P.2d 908 (Ariz.1970), and *Williams v. State*, 183 Ark. 870, 39 S.W.2d 295 (1931).

This Court has the statutory authority to reform a judgment as the law and the nature of the case may require. The State, through her district attorney, has indicated to this Court that "a retrial of this case would not be in the best interest of justice and of the public and that the State desires to forego such a retrial and the possibility of a death penalty in this case." The nature of this case today dictates that the judgment in the case be reformed to reflect the punishment of life imprisonment.

If the State of Texas, through her elected prosecutor, certifies that justice would be served by such a reformation, then this Court can and should reform the judgment. Similarly, if the State feels that death is indeed proper and wishes to again seek that punishment, then that option should be available also.

This Court is charged by statute to determine appeals with due regard to the rights of the parties and proper administration of justice. Article 44.23, V.A.C.C.P.

As pointed out by Judge Roberts in his dissenting opinion in *Evans v. State*, 614 S.W.2d 414 (1980):

"There is nothing in the Constitution that requires us to set aside the judgments of guilt (which is free of error so far as the Court tells us); to cloak the properly-convicted appellants in the presumption of innocence; to require the State to marshall evidence that is years and years old; and to require the sizeable expenditure of time and money that attends a capital trial."

Both reason and justice indicate that this Court should give careful consideration to the "nature of the case" before it, and if justice would best be served by reforming appellant's punishment of life imprisonment, that is what should be done.

The majority has concluded that our statutory scheme prohibits the results set forth in this opinion. Perhaps today's decision will ring the death knell for the rule requiring a complete retrial of guilt when an error has occurred at the sentencing stage. The Legislature can, and should, immediately remedy by amendment the law that allows a lawfully convicted felon another trial when there was no constitutional infirmity in the verdict that found him guilty.

Finally, I am compelled to speak briefly to the concurring opinion that has been filed in this case. I believe my reasons for concluding as I have are sufficiently set forth above. I do not, however, believe that when this Court reaches a legal conclusion that is also logical we are being pragmatics. Instead, I believe we have accomplished that which is the intent of the law. Some people call it Justice.

I dissent.

ROBERTS, J., joins in Part I and Part II only.

DALLY, J., joins in the dissent.