**Jerry HARTFIELD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 59343.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 17, 1980.

On Rehearing Jan. 26, 1983.

Rehearing Denied March 1, 1983.

Robert A. Scardino, Jr., Houston, for appellant.

Jack Salyer, Dist. Atty., Bay City, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

The appellant was found guilty of capital murder, and his punishment was fixed at death. He complains that a venirewoman was excluded improperly from the jury and that his confession was received improperly.

Section 12.31(b) of our Penal Code requires that:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

The Sixth and Fourteenth Amendments to the United States Constitution are violated if Section 12.31(b) is used to exclude jurors on grounds broader than those established in the *Witherspoon* line of cases.[1] *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Shippy v. State,* 556 S.W.2d 246, 257 (Tex.Cr.App.) (Roberts, J., dissenting), *cert. denied,* 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977).

*Adams v. Texas,* supra, 448 U.S. at 45, 100 S.Ct. at 2526, teaches that:

"a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court."

In the Texas scheme of special issues (V.A. C.C.P., Art. 37.071(b)), this means that a juror may be excluded either because he is not willing to accept that death may be a punishment in certain circumstances or because he is not willing and able to answer the statutory questions impartially, without conscious distortion or bias. *Id.* at 46, 100 S.Ct. at 2527. Yet a juror is not to be excused merely because his views about the death penalty might influence the manner in which he exercises his discretion within the guidelines permitted him under Texas law. *Id.* at 46, 100 S.Ct. at 2527. Section 12.31(b) may not be used to exclude jurors whose deliberations would be affected only by greater seriousness and gravity or emotional involvement, or who cannot state positively whether their deliberations would be "affected" in any way. *Id.* at 49–50, 100 S.Ct. at 2528–2529.

"Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law."

*Id.* at 50, 100 S.Ct. at 2529.

■ The latter passage from *Adams v. Texas,* which we have quoted above, well describes Venirewoman Hlozek in this case. Her answers to about 75 questions from the court and counsel established three things: she would not vote automatically against the imposition of capital punishment;[2] her

---

1. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Boulden v. Holman,* 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

2. Hlozek did not "believe in giving death," and hoped she would not have to.

"Q You would exclude it in every case?
"A I think so.
"Q Well, you think so. Does that mean that maybe in some cases you would consider it in a case that was bad enough?

"A To me it would have to be proven before I could.
"Q It would have to be proven to be a real bad case before you could consider the death penalty? Is that what you are telling us?
"A Uh huh.
"Q Does that mean, then, that you would not exclude the death penalty in every case?
"Let's say, for example, the prosecutor brought you a case of a real bad murder where a man premeditated the murder, he goes out and gets a big old knife to commit the murder and he carries out his evil plan

answers to the special issues at the punishment stage of the trial would be based on the evidence; and she could not promise that she would be unaffected by her knowledge of the possible penalty.

"Q * * * The question is: Would this knowledge affect your deliberations on any issue of fact presented to you by the Court?

"A It would.

"Q Ma'am?

"A It would.

"Q That is what you said a while ago. Your answer is 'yes'?

"A It would have to be.

"Q Let me try to make sure you understand the question. [Explanation of sentencing procedure omitted.]

"I will ask you again: With this knowledge that you now have that we have the mandatory penalty in Texas of life imprisonment or death, would this knowledge affect your deliberations on any issues of fact?

"A Yes. It would.

   *     *     *     *     *     *

"Q * * * Well, one of these things is going to happen, and it depends on how you answer these two questions.

"If you answer them both yes, then the Judge is going to sentence him to death—if you answer them both yes.

just as he schemed and designed and commits a murder—tears somebody's body apart, somebody's family member, somebody's breadwinner is now dead because of that murder.

"A I think then I can, but not—

"Q Then you could?

"A But somebody that did it on the spur of the moment—

"Q Oh, the spur-of-the moment type you couldn't give the death penalty?

"But if somebody premeditated the murder and the State proved it beyond a reasonable doubt then you could consider the death penalty then?

"A I think so.

   *     *     *     *     *     *

"THE COURT: * * *

"Are you so opposed to the death penalty that there is no case that you could assess it in?

"If you answer either one of them no, the Judge sentences him to life in the penitentiary.

"That is the way it works. Do you understand the procedure now?

"A Yes.

"Q Now, what the prosecutor is asking you is this:

"Can you answer these questions as the law says you should and that is by the evidence that is presented before you, and not have the end result of these questions affect the way you answer them? See?

"A No.

"Q You would answer one of them so that you wouldn't give the death penalty?... that he wouldn't get the death penalty?

"See, that is what we are trying to find out.

"If you were sitting in a murder case where it was a bad murder case, like the one we talked about where you could consider the death penalty—that kind of murder, and you came down to the punishment stage and you had heard evidence that he meant to kill, would you answer that yes or no?

"A That one I would have to answer yes.

"Q You would have to answer it yes?

"And you came down and you had to decide whether or not he would be a

"MRS. HLOZEK: I guess the answer would have to be 'no.'

   *     *     *     *     *     *

"Q Let me ask a few more questions.

"You told me before that if it was the proper kind of case, if it was a bad enough killing, that you could consider the death penalty.

"Is that what you told me?

"A Only if it would be bad enough.

"Q Only if it was bad enough?

"A ... premeditated.

"Q All right. So there are some cases that you would consider the death penalty?

"A But they would have to be bad.

"Q Okay. But the answer to my question, then, is 'yes'?... there are some cases where you could consider the death penalty?

"A Yes."

continuing threat to society and would probably commit violent acts in the future and you heard evidence that he would and he has, now, how would you answer that?. . .yes or no?

"A  Yes, I guess.

"Q  You would answer it yes?

"A  Yes.

"Q  So you would answer your questions based on the evidence, then?

"A  Yes.

"Q  You wouldn't answer the second question 'no' to avoid giving the death penalty in that case?

"A  Not if it was a real bad murder.

\*    \*    \*    \*    \*    \*

"Q  Are you saying, Ma'am, that your knowledge that judgment of death or life working out there, as he put it, would not affect your answers to those two questions?

"A  Yes, it would.

\*    \*    \*    \*    \*    \*

"THE COURT:  \* \* \*

"Now, after all of that, then what they are asking you is: Would the knowledge, your knowing in your own mind that how you answer those two questions is going to affect what I do, is that going to cause you any trouble in answering those two questions?

"MRS. HLOZEK: Yes, it would, knowing what I know.  I mean—

"THE COURT:  . . . knowing that your answers to the two questions would have a bearing on what I do?

"MRS. HLOZEK: Yes.  It would.

"THE COURT: So then the question is:

"Would that affect you in your making a decision as to how to answer the questions?

"MRS. HLOZEK: Yes, it would.

\*    \*    \*    \*    \*    \*

"THE COURT:  \* \* \*

"Now, will you answer those questions based upon the evidence without regard to what I have to do?

"MRS. HLOZEK: I don't believe so.

\*    \*    \*    \*    \*    \*

"Q  One of the laws is that we must have jurors that can answer those questions based on the evidence.

"In fact, the law says the Judge must make each one take a solemn oath that that is just what they will do: Answer these questions—these two questions based on the evidence and nothing else in every death penalty case that is ever tried in this state.  This is the way that it's got to be done and we are trying to find out what you would do.

"Would you answer these questions based on the evidence?

"A  Yes.

"Q  Okay.  Would you allow the effect of your answers—would you allow the result of your answers to affect the way you would answer them?

"A  Yes.

"Q  You would?

"A  Yes.

"Q  Now, that is where we are having problems.

\*    \*    \*    \*    \*    \*

"THE COURT:  \* \* \*

"Would you answer both of those questions in any case—not this case—but in any other case that you were sitting on, would you answer both of those questions based solely upon what you heard and see as evidence or testimony and nothing else, and regardless of what you thought or knew I as a judge would have to do?

"MRS. HLOZEK: It would still affect the way I feel on what you asked me.

"THE COURT:  .Well, we understand that, but would you go ahead and do it anyway, or would you not do it anyway?

\*    \*    \*    \*    \*    \*

"I don't know how to put it any other way—but you are just not going to do it?

"MRS. HLOZEK: If he had done something bad enough I guess I would.

\*    \*    \*    \*    \*    \*

"By Mr. Salyer:

"Q Can you state to this Court under oath that the mandatory penalty of death or imprisonment for life will not affect your deliberations on any issue of fact?

"A I guess I can't answer that because it's confusing.

"It would affect the way I—

"Q Well, that is your answer, if it would.

"Well, can you state under oath that it would not?

"A No.

"MR. SALYER: Your Honor, we submit under the statutory definition—

"THE COURT: I will sustain the challenge and you may have your exception.

"MR. SCARDINO: We make an exception, Your Honor, to the Court's ruling.

"THE COURT: Thank you, Mrs. Hlozek."

■ The burden of these answers (not all of which were perfectly clear) was that the venirewoman would follow the law, that she would base her verdict on the evidence, that she could answer Yes to the special issues, but that her answers might be affected by her knowledge of the possible penalty. The application of Section 12.31(b) to excuse her was a violation of the Sixth and Fourteenth Amendments. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). Even one such violation means the death penalty may not be imposed. See *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399 (1976). As a matter of state law, it also means that the judgment must be reversed and the cause remanded for a new trial. *Evans v. State,* 614 S.W.2d 414 (Tex.Cr.App.1980).

Reversed and remanded.

CLINTON, J., not participating.

## OPINION ON STATE'S MOTION FOR REHEARING

**W.C. DAVIS, Judge.**

On original submission appellant's conviction for capital murder was reversed and the cause was remanded. We concluded that a prospective juror had been excluded in violation of the holdings in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

We have granted the State's motion for leave to file motion for rehearing in order to consider its allegations that our original holding was incorrect because (1) Mrs. Hlozek was properly excused under *Witherspoon,* supra, or (2) if excusing Hlozek was error, it was harmless in that the State had peremptory challenges remaining at the conclusion of the voir dire examination.

Upon reconsideration, we continue to adhere to our original holding, that:

"the venirewoman [Hlozek] would follow the law, that she would base her verdict on the evidence, that she could answer Yes to the special issues, but that her answers might be affected by her knowledge of the possible penalty. The application of Section 12.31(b) to excuse her was a violation of the Sixth and Fourteenth Amendments."

■ The State's only meritorious issue raised in this regard is whether appellant failed to properly preserve his error as to the exclusion of this venirewoman. The State now maintains that while appellant's trial counsel made "an exception" to the court's ruling, this constituted nothing more than a general objection and he therefore waived any possible error. We do not agree. It must be kept in mind that the voir dire examination in question took place in June of 1977, three full years prior to the June 1980 decision in *Adams,* supra. Therefore, at the time Hlozek was excused, Sec. 12.31(b) was considered constitutional even to the extent that it allowed exclusion of prospective jurors on a broader ground than *Witherspoon,* supra, and consequently there was no reason for appellant's counsel to strenuously attempt to preserve his error. We find that appellant did not waive his error. The improper exclusion of even one

juror requires that the death sentence not be imposed. *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 399 (1976). The State's contention is overruled.[1]

■ The State next maintains that the error in excluding Hlozek was harmless in that the State had peremptory challenges remaining after the voir dire examination. This argument has been previously argued before this Court and has been previously found to be of no merit. *Grajalva v. State,* 614 S.W.2d 420, 425 (Tex.Cr.App.1981);[2] *Pierson v. State,* 614 S.W.2d 102 (Tex.Cr.App.1981). The error was not harmless.

■ Alternatively the State urges us "to affirm the finding of guilt, vacate the death 'sentence,' and reform the judgment so as to reflect a punishment of life imprisonment," or allow them a "reasonable time to seek commutation of 'sentence' from the Governor."

When the death sentence has been improperly imposed based upon the "special verdict" of a jury impaneled in violation of *Witherspoon/Adams,* the long-held policy of this Court has been to reverse the cause for an entirely new trial, rather than reform the sentence to life imprisonment, the only other alternative. Article 37.071, V.A.C.C.P.; *Ellison v. State,* 432 S.W.2d 955 (Tex.Cr.App.1968); *Grider v. State,* 468 S.W.2d 393 (Tex.Cr.App.1971); *Ocker v. State,* 477 S.W.2d 288 (Tex.Cr.App.1972); *Evans v. State,* 614 S.W.2d 414 (Tex.Cr.App.1981); *Turner v. State,* 635 S.W.2d 737 (Tex.Cr.

App.1982).[3] We must reluctantly deny the State's request.

Further, as to the State's request for a "reasonable time to seek commutation of 'sentence' from the Governor," we direct their attention to Tex.Cr.App.R. 310, which states in part:

"When a decision of the Court of Criminal Appeals becomes final, the Clerk of the Court shall issue a mandate to the court below. A decision of the Court shall be final at the expiration of 15 days from the ruling on the final motion for rehearing or from the rendition of the decision if no motion for rehearing is filed."

We hold that the 15 day period between the rendition of our decision and the date that the mandate issues is a "reasonable time to seek commutation of 'sentence' from the Governor." Also see Tex.Cr.App.R. 311, which provides for a stay of mandate for not more than 60 days.

For the foregoing reasons the State's Motion for Rehearing is denied.

TEAGUE, J., not participating.

<hr />

1. Our present holding obviously applies only to cases in which voir dire examination took place *prior* to the holding in *Adams,* supra. In cases subsequent to *Adams,* the contemporaneous objection rule continues to apply to the preservation of error during voir dire examination. Additionally, this holding is made in light of the United States Supreme Court's disposition of *May v. State,* 618 S.W.2d 333 (Tex.Cr.App.1981), vacated in *May v. Texas,* 454 U.S. 959, 102 S.Ct. 497, 70 L.Ed.2d 374 (1981), on remand *May v. State,* 632 S.W.2d 751 (Tex.Cr.App.1982).

2. Overruling *Chambers v. State,* 568 S.W.2d 313 (Tex.Cr.App.1978).

3. This appears to be a rather burdensome remedy in a case where the only error is found in the punishment phase of the trial, Art. 37.071,

supra, and where the State requests that we reform the faulty death sentence to life imprisonment, thereby waiving its right to again seek the death sentence. It is clear that the purposes for this remedy under the former Penal Code, 1927 Texas General Laws, ch. 274, Sec. 1, Texas Revised Penal Code of 1925, Art. 1257 (repealed in 1973), no longer exist under the present Penal Code's only options of death or life imprisonment. See *Ellison,* supra; *Grider,* supra; *Ocker,* supra. It is the author's opinion that this significant issue is now ripe for reconsideration by the Texas Legislature in light of the capital punishment scheme as it now stands. Accord *Pierson,* supra (McCormick, J. dissenting); *Evans,* supra (Roberts, J. dissenting).